KENNETH E. KELLER (SBN 71450) kkeller@kksrr.com
MICHAEL D. LISI (SBN 196974) mlisi@kksrr.com
ANNE E. KEARNS (SBN 183336) akearns@kksrr.com
GARTH A. ROSENGREN (SBN 215732) grosengren@kksrr.com
KRIEG, KELLER, SLOAN, REILLEY & ROMAN LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
Telephone: (415) 249-8330
Facsimile: (415) 249-8333

STEVAN H. LIEBERMAN (*Pro Hac Vice Pending*) stevan@APLegal.com
GREENBERG & LIEBERMAN, LLC
2141 Wisconsin Ave., NW Suite C2
Washington, DC 20007
Telephone: (202) 625-7000
Facsimile: (202) 625-7001
Attorneys for Plaintiff
AMARETTO RANCH BREEDABLES, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMARETTO RANCH BREEDABLES, LLC, a California Limited Liability Corporation<br><br>Plaintiff,<br><br>v.<br><br>OZIMALS, INC., an Alabama corporation,<br><br>Defendant. | CASE No.: CV 10-5696 CRB<br><br>**PLAINTIFF'S SUPPLEMENTAL BRIEF RE JURISDICTION AND THE *NOERR-PENNINGTON* DOCTRINE** |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................. 1

II.   BRIEF STATEMENT OF RELEVANT FACTS ................................................ 2

III.  THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT ........................ 4

      A.    This Court Has General Jurisdiction over Defendant ................................. 5

            1.    Defendant Has Substantial, Continuous and Systematic Contacts ................ 5

            2.    The Assertion of Jurisdiction Is Reasonable ..................................... 7

      B.    This Court Has Specific Jurisdiction over Defendant ................................. 9

            1.    The Purposeful Availment Prong Is Satisfied ................................. 10

            2.    The Claim Arises out of Defendant's Forum-Related Activities ................. 12

            3.    The Exercise of Jurisdiction Comports with Fair Play and
                  Substantial Justice .................................................. 12

IV.   PLAINTIFF HAS NOT FILED AN "ANTICIPATORY CLAIM" ................................... 12

V.    PLAINTIFF'S SUIT DOES NOT VIOLATE DEFENDANT'S FIRST
      AMENDMENT  RIGHTS. ...................................................... 14

      A.    Plaintiff's Action Does Not Burden any Protected Conduct. ................. 15

      B.    A DMCA Take Down Notice is Not Protected Conduct. ........................... 16

      C.    Defendant's DMCA Notice is a "Sham" and thus not Entitled to
            Protection. ...................................................... 18

      D.    An Action Pursuant to the DMCA is Constitutional. ................................. 19

VI.   A BOND OF $10,000 IS APPROPRIATE ........................................... 20

VII.  CONCLUSION ............................................................. 21

i

# TABLE OF AUTHORITIES

**Cases**

17 U.S.C. § 512(c)(3) ............................................................................................ 14, 16, 17

*Affliction Holdings v. Simon Chen*, C-10-0933VRW (N.D. Cal.) ................................... 21

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988) ............................................................................................ 18

*Amoco Egypt Oil Co. v. Leonis Navigation Co., Inc.*,
    1 F.3d 848 (9th Cir. 1993) ..................................................................................... 7

*Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*,
    223 F.3d 1082 (9th Cir. 2000) ......................................................................... 5, 11

*BE & K Construction Co. v. NLRB*,
    536 U.S. 516 (2002) ............................................................................................ 15

*Bill Johnson's Restaurants, Inc. v. N.L.R.B.*,
    461 U.S. 731 (1983) ............................................................................................ 18

*Boschetto v. Hansing*,
    539 F.3d 1011 (9th Cir. 2008) .............................................................................. 4

*Calder v. Jones*,
    465 U.S 783 (1984) ............................................................................................. 10

*Chanel Inc. v. Paley*, C-09-4979MHP (N.D. Cal.) ...................................................... 21

*Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*,
    944 F.2d 1525 (9th Cir.1991) ............................................................................. 17

*Core-Vent Corp. v. Nobel Industries AB*,
    11 F3d 1482 (9th Cir. 1994) ................................................................................. 8

*Dole Food Co., Inc. v. Watts*,
    303 F.3d 1104 (9th Cir. 2002) ............................................................................ 12

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*,
    514 F.3d 1063 (10th Cir. 2008) .......................................................................... 11

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982) ............................................................................................ 20

*Freeman v. Lasky, Haas & Cohler*,
    410 F.3d 1180 (9th Cir.2005) ............................................................................. 17

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2002) ............................................................................ 20

*Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements, Ltd.*,
    328 F.3d 1122 (9th Cir. 2003) .............................................................................. 5

*Helicopteros Nacionales De Colombia v. Hall*,
    466 U.S. 408 (1984) ............................................................................................. 5

*Hellenic Inv. Fund, Inc. v. Det Norske Veritas*,
    464 F.3d 514 (5th Cir. 2006) ................................................................................ 7

*International Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ............................................................................................. 5

ii

*Kearney v. Foley & Lardner, LLP*,
   590 F.3d 638 (9th Cir., 2009) ............................................................................. 19

*Kottle v. Northwest Kidney Centers*,
   146 F.3d 1056 (9th Cir. 1998) ............................................................................. 18

*Lake v. Lake*,
   817 F.2d 1416 (9th Cir. 1987) ............................................................................. 12

*Noble Drilling Services, Inc. v. Certex USA, Inc.*,
   620 F.3d 469 (5th Cir. 2010) ................................................................................. 7

*Pacific Bell Internet Services v. Recording Industry Assoc. of America, Inc.*,
   2003 WL 22862662 (N.D. Cal. 2003) ................................................................ 13

*Palantir Technologies, Inc. v. Palantir.net, Inc.*,
   2007 WL 2900499 (N.D. Cal. 2007) .................................................................. 13

*Pebble Beach Co. v. Caddy*,
   453 F.3d 1151 (9th Cir. 2006) ............................................................................... 5

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
   508 U.S. 49 (1993) ............................................................................................... 19

*Rossi v. MPAA*,
   391 F.3d 1000 (9th Cir. 2004) ............................................................................. 20

*Schwarzenegger v. Fred Martin Motor Co.*,
   374 F.3d 797 (9th Cir. 2004) ................................................................................. 5

*Sher v. Johnson*,
   911 F.2d 1357 (9th Cir. 1990) ............................................................................... 8

*Sosa v. DirecTV, Inc.*,
   437 F.3d 923  (9th Cir. 2005) ....................................................................... passim

*Tuazon v. R.J. Reynolds Tobacco Co.*,
   433 F.3d 1163 (9th Cir. 2006) ...................................................................... 7, 8, 9

*YAHOO! Inc. v. La Ligue Centre Le Racisme Et L'Antisemitisme*,
   433 F. 3d 1199 (9th Cir. 2006) ........................................................................... 10

**Statutes**

17 U.S.C. § 512(f) ..................................................................................................... passim

17 U.S.C. § 512(f)(1) ....................................................................................................... 15

17 U.S.C. § 512(g) ............................................................................................................. 3

17 U.S.C. § 512(g)(2)(C) ................................................................................................... 3

17 U.S.C. § 517(g)(3) ........................................................................................................ 3

Cal. Code. Civ. § 410.10 .................................................................................................... 5

**Rules**

Fed.R.Civ.P. 56(c) ........................................................................................................... 20

iii

## I.    INTRODUCTION

As of 5:00 p.m. today – absent a temporary restraining order put in place by this Court – Defendant will have achieved its goal of interrupting sales of all of Plaintiff's products during the holidays – the busiest retail season of the year.  Defendant's marketing partner, Linden Labs,[1] has informed Plaintiff that, by close of business today, it will forcibly remove Plaintiff's products from the market in Second Life pursuant to Defendant's "revised" DMCA take down notice which it issued yesterday.  (*See* Declaration of Michael D. Lisi in Support of Ex Parte Application for Temporary Restraining Order ("Lisi Decl.") (e-docket 22), ¶¶ 3, 4, 6.)  In other words, despite Plaintiff having instituted this TRO proceeding six days ago, despite the evidence introduced into the record of Plaintiff's questionable copyright infringement registration and non-infringement of any alleged copyrights, and despite the fact that this Court has not yet rendered a decision as to Plaintiff's requested relief, Defendant has nonetheless preemptively issued a second DMCA notice (identical to its first notice in nearly every respect, even down to the date in the header of the document) purporting to have a good faith belief that Plaintiff is infringing its products – despite the fact that nothing could be further from the truth.

However, Defendant's second DMCA notice is as meritless as the first.  Defendant does not and cannot have a copyright on the concept for or features of the breedable, virtual animals in Second Life that both it and Plaintiff have created.  Defendant to date has not identified any subject of alleged infringement that is not either an idea, an unoriginal expression of an idea, and functional expression of an idea, or part of the scenes a faire of breedable, virtual animals generally.

But the merits of its claim is not important to Defendant, merely the timing is.  Defendant's scheme is obvious: to time the take down of Plaintiff's product with the holidays.  That intent is apparent in Defendant's delay in re-issuing its defective DMCA notice – from December 1 to December 20 – and its effort to stall this Court's decision on Plaintiff's TRO, from suggesting that a possibility of settlement exists when in fact Defendant's demand is that Plaintiff "give away" its

---

[1] See Declaration of Anne E. Kearns in Support of Plaintiff's Supplemental Brief Re Jurisdiction and *Noerr-Pennington* Doctrine ("Kearns Decl."), ¶ 6, Ex. E, filed herewith.

products[2] to Defendant's recent oblique suggestions that this Court may lack jurisdiction and the Defendant's right to petition is being violated.  As set forth below, Defendant is wrong on both counts; it is not even a close question.

Now, Defendant is on the cusp of success.  Linden Labs – a partner in promoting Defendant's products – will remove Plaintiff's products from the Second Life marketplace by the end of today.  Soon thereafter, Linden will close its offices for the holidays, not returning until Tuesday, December 28, during which time Linden will apparently be unable to return Plaintiff's products to the marketplace even should this Court issue the requested TRO.  (*See* Lisi Decl, (e-docket 22), ¶ 7.)Defendant will have succeeded in creating the impression in the Second Life community that Plaintiff's products are infringing (and thus not worth investing in), and Plaintiff will have been denied the opportunity to sell its products during the crucial run-up to Christmas and over the Christmas weekend.

This Court has jurisdiction to enter the TRO and hear Plaintiff's case.  Defendant's right to petition is not at issue.  As set forth in Plaintiff's moving papers, Plaintiff is likely to succeed on the merits of its case and will suffer further and irreparable harm if this Court does not grant the requested TRO.  Plaintiff respectfully requests that this Court do so forthwith and allow it remaining place until the hearing on Plaintiff's preliminary injunction set for January 12.

## II.    BRIEF STATEMENT OF RELEVANT FACTS

Both Plaintiff and Defendant create, market and sell breedable animals for profit in Second Life, a 3-D virtual Internet world operated by Linden Research, Inc., headquartered in San Francisco, California.  (*See* Kearns Decl., Ex. F.)

Plaintiff sells virtual horses and food (the "Horse Product Line") and Defendant sells "virtual bunnies." (*See* Complaint ("Compl.") ¶ 7 (e-docket 1); *see also* Complaint filed by Defendant in the

---

[2] As explained at the December 19th hearing, "free food" does not cure the irreparable harm set forth in Plaintiff's moving papers.  As the recently filed declaration from actual purchasers and resellers of Plaintiff's horses demonstrate, the take down of Plaintiff's products uncertainty surrounding the ability to resell those products is dramatically harming Plaintiff's reputation and goodwill.  (*See e.g.* e-docket 13, 14, 16, and 17.)

Northern District of Alabama (the "Ozimals Compl.") at ¶ 1, attached as Ex. A to Kearns Dec., ¶ 2).[3]

On November 2, 2010, Defendant served a cease and desist letter upon Plaintiff claiming that its Horse Product Line infringed upon its alleged copyright in its "virtual bunnies." Defendant threatened to file a "take down notice" under the Digital Millennium Copyright Act ("DMCA") and to enforce it intellectual property rights. (*See* Ex. 3 to Compl.). Plaintiff responded to the cease and desist letter on November 22, 2010, setting forth the reasons why Defendant did not have a protectable copyright in its "virtual bunnies" as it so asserted. (Ex. 4 to Compl.).

On December 1, 2010, Defendant made good on its threat and served a DMCA "take down notice" (the "First DMCA Notification") on Linden Research claiming that Plaintiff's Horse Product Line infringed upon its alleged copyright in its "virtual bunny." (Ex. 5 to Compl.). Under the DMCA, a "take down notice" requires the internet service provider, in this case, Linden Research, to expeditiously take down all alleging infringing material from its server. 17 U.S.C. § 512(g). The material remains down for no less than ten (10) days, and nor more than fourteen (14) days, unless the accuser gives notice to the service provider that it has filed a lawsuit seeking a court order to restrain the alleged infringer from engaging in infringing activity relating to the material on the service provider's system. 17 U.S.C. § 512(g)(2)(C). Thus, upon the accuser's timely filing of a lawsuit, the "take down notice" results in an immediate injunction against the alleged infringer without any due process and regardless of whether the allegedly infringing product actually infringes.

On December 9, 2010, Plaintiff filed a counter-designation with Linden Research pursuant to 17 U.S.C. § 512(g)(3) setting forth the reasons why its product should not be taken down from Second Life. (Ex. 6 to Compl.).

On December 15, 2010, Plaintiff filed this lawsuit claiming that under 17 U.S.C. § 512(f) Defendant materially misrepresented in its First DMCA Notification that Defendant owned a copyright in the "virtual bunnies," and that Plaintiff infringed upon it with its Horse Product Line.

---

[3] Plaintiff will be moving to dismiss, stay and/or transfer the lawsuit filed in Alabama.

3

Plaintiff also seeks declaratory judgment and asserts several other tort claims.  (e-docket 1).

Plaintiff also sought a temporary restraining order to restrain Linden Research from taking down Plaintiff's product from Second Life pursuant to the First DMCA Notification and any amendments or corrections thereto.  (e-docket  3, 4).  The Court set a hearing for December 17, 2010.  (e-docket 11).  At the December 17, 2010 hearing, the Court ordered the parties to discuss a possible stipulated temporary restraining order and to appear on December 20, 2010 for a further hearing.  The parties were not able to agree upon a stipulated temporary restraining order.

On December 20, 2010, Defendant filed a revised DMCA Notification (the "Second DMCA Notification") with Linden Research, apparently correcting certain deficiencies of the First DMCA Notification.  (A copy of the Second DMCA Notification is attached as Ex. B to Kearns Dec., ¶ 3). Later that day, Linden Research advised Plaintiff that it would take down its product pursuant to the Second DMCA Notification **by the close of business today, December 21, 2010**.  (See Lisi Decl. (e-docket 22), ¶¶ 4, 6.)

On December 20, 2010, Defendant also filed a complaint in the Northern District of Alabama (the "Ozimals Compl.") alleging, among other things that Plaintiff has infringed upon Defendant's alleged copyright in its "virtual bunnies."  (Ex. A to Kearns Dec.).

At the December 20, 2010 hearing, the Court ordered the parties to submit supplemental briefs regarding jurisdiction and whether the *Noerr-Pennington* doctrine bars Plaintiff's claims. (e-docket 21).  Thereafter, the Court asked the parties to address the issue of the amount of the bond should a TRO issue.  As set forth below, this Court should immediately issue a temporary restraining order because it has personal jurisdiction over Defendant, and the *Noerr-Pennington* doctrine is not a bar to Plaintiff's claims.

## III.    THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT

Personal jurisdiction in this District is proper provided it is "consistent with the [California] long-arm statute, and if it comports with due process of law." *Boschetto v. Hansing*, 539 F.3d 1011 (9th Cir. 2008).   The long-arm statute in California extends the exercise of personal jurisdiction to the limits of due process.  *Id.*; *see also, Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements,*

*Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003) (citing Cal. Code. Civ. § 410.10).  In order to satisfy due process, "a defendant must have 'minimum contacts' with the forum state such that the assertion of jurisdiction 'does not offend traditional notions of fair play and substantial justice'" *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 315 (1945)).

Personal jurisdiction over a defendant may either be general or specific.  General jurisdiction is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to the contacts.  Specific jurisdiction, on the other hand, exists when a "State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales De Colombia v. Hall*, 466 U.S. 408, 414-416, fn. 8-9 (1984).

As set forth below, this Court has both general and specific jurisdiction over Defendant.

**A.      This Court Has General Jurisdiction over Defendant**

**1.      Defendant Has Substantial, Continuous and Systematic Contacts**

For general jurisdiction to exist, the defendant must engage in "substantial" or continuous and systematic" contacts that approximate physical presence in the forum state. *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000) (citation omitted).  "This is an exacting standard, as it should be, because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004).

The factors that the Ninth Circuit considers when determining whether or not there is general jurisdiction are "whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." *Bancroft & Masters, Inc. v. August Nat'l Inc.*, 223 F.3d at 1086.

Here, Defendant has substantial, continuous and systematic contacts with California.  First, Ozimals admits in its recently filed complaint that it "develops, markets, and distributes computer software for virtual, breedable animals and associated products, which are licensed by customers for

5

consideration in an online virtual world known as Second Life." (Ozimals Compl, ¶ 1). Thus, its entire business platform centers around selling product through a California corporation -- Linden Research, the operator of Second Life, which is headquartered here in San Francisco at 945 Battery Street. (Ex. F, Kearns Dec., ¶ 7). Every time it sells or licenses a "virtual bunny" or food for the "virtual bunny," it does so through Linden's servers here in California.

Moreover, in order to do business with Linden Research, Defendant is obligated to pay Linden Research a fee for every sale its makes. (*See* Second Life Marketplace Fee and Listing Policies, attached as Ex. C to Kearns Dec., ¶ 4: "We charge SL Marketplace merchants a Commission for each sale that the seller makes…. Commission rates are five (5) percent of the listed price, rounded to the nearest Linden Dollar (L$)). Defendant is therefore constantly "doing business" with Linden Research.

In addition, according to Defendant's own blog, in October 2010, Defendant entered into a "special collaboration" with Linden Labs to "produce promotional email that will be sent to all Second Life Premium Members with an offer for an exclusive Ozimals Bunny…." (*See* October 14, 2010 Ozimals Blog, attached as Ex. E. Kearns Dec.). According to the blog, this collaboration will "provide lots of exposure to bunnies, our wonderful community, and bring a whole new generation of Second Life Residents into the entertaining hobby of owning and breeding Ozimals bunnies." (*Id*.) Thus, Defendant actively partners with a company headquartered in California to sell in California the very product it alleges Plaintiff is infringing by selling its products in California. This Court's jurisdiction is manifest.

Importantly, in order to do business with Linden Research, Defendant must and <u>has submitted</u> <u>to</u> <u>the</u> <u>jurisdiction</u> of the courts here in California:

> You and Linden Lab agree to submit to the exclusive jurisdiction and venue of the courts located in the City and County of San Francisco, California. Notwithstanding this, either party shall still be allowed to apply for injunctive or other equitable relief to protect or enforce that party's intellectual property rights in any court of competent jurisdiction where the other party resides or has its principal place of business.

(*See* Linden Labs Terms of Service, ¶ 6, attached as Ex. D to Kearns Dec., ¶ 5).

Defendant is estopped from claiming that this provision does not apply vis-a-vis *Plaintiff*

6

since it is this very contract with Linden Research that allows Defendant to do business in California; to sell its "virtual bunnies" on Second Life; and to file a DMCA take down notice with Linden Research against Plaintiff.  In short, it cannot reap the contract's benefits, but avoid its "detrimental" provisions, namely, agreeing to jurisidiction in the courts located in San Francisco, which would include this Court.  *See e.g., Noble Drilling Services, Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010) (citing to *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517-20 (5th Cir. 2006) (applying direct benefits estoppel when a non-signatory knowingly accepted benefits and brought claims that had to be determined by reference to contract containing forum selection clause).

Thus, it is clear that Defendant is substantially, continuously, and systematically doing business in California and within this judicial district, and is therefore subject to personal jurisdiction.  Defendant's entire business model is based upon doing business with a California company, namely Linden Research.  Its sales are generated through Linden Research.  It has a marketing plan through Linden Research.  It regularly pays fees to Linden Research.  It has specifically agreed to be subject to the courts here in San Francisco.  Moreover, by doing business with a California company, Defendant specifically acknowledges that it is subject to the jurisdiction of this Court.

## 2.     The Assertion of Jurisdiction Is Reasonable

In addition to minimum contacts, the assertion of general jurisdiction must also be reasonable.  *Amoco Egypt Oil Co. v. Leonis Navigation Co., Inc.*, 1 F.3d 848, 852-23 (9th Cir. 1993).  Courts consider several factors to determine if the exercise of jurisdiction will comport with fair play and substantial justice:  1) The extent of defendant's "purposeful" interjection; 2)  The burden on defendant in defending in the forum; 3)  The extent of conflict with the sovereignty of the defendant's state; 4)  The forum state's interest in adjudicating the dispute; 5 )  The most efficient judicial resolution of the controversy; 6) The importance of the forum to plaintiff's interest in convenient and effective relief; and 7)  The existence of an alternative forum.  *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1174 (9th Cir. 2006).  No one factor is dispositive. Rather,

7

the court must balance all seven.  *Core-Vent Corp. v. Nobel Industries AB*, 11 F3d 1482, 1488 (9th Cir. 1994).  An analysis of these factors weighs in favor of Plaintiff.

### a)  The Extent of Purposeful Interjection

This first factor "parallels the question of minimum contacts."  *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d at 1174, fn 5.  As set forth above, Defendant has purposefully interjected itself into this forum through it substantial contacts.  It entered into contract with Linden Research, located in California, to sell its virtual "bunnies" in Second Life which allows it to make money from selling product through Linden Research.  Defendant has agreed to pay Linden Research a fee for every sale it makes.  It has collaborated with Linden Research to market bunnies on Second Life. As a condition to doing business with Linden Research, Defendant has also consented to California jurisdiction.  Moreover, as discussed below, Defendant sent a cease and desist letter threatening Plaintiff that it would file a DMCA "take down notice" and enforce its intellectual property rights.  It also served two DMCA Notifications to Linden Research in California to force it to take down Plaintiff's products.  This criteria is amply met.

### b)  The Burden on Defendant

Defendant will have a slight burden to defend in California.  However, as noted by the Ninth Circuit, requiring a nonresident to defend locally is not constitutionally unreasonable "in this era of fax machines and discount air travel."  *Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990).

Moreover, Defendant understood the risk when it chose to sell its "virtual bunnies" on Second Life and to abide by its terms, including consenting to the jurisdiction of California.

### c)  The Extent of Conflict with the Sovereignty of the Defendant's State

As a general matter, federal law will govern the crux of the claims (the 17 U.S.C. § 512(f) claim and the Declaratory Judgment Act claim).  However, the Courts in Alabama – where Defendant resides – cannot confer personal jurisdiction over Plaintiff.  Plaintiff has no contacts with Alabama.  It resides in California and does its business in California (*e.g.*, selling the Horse Product Line on Second Life in California).  The lawsuit recently filed by Defendant against Plaintiff in

Alabama should be dismissed.

### d)   California Has an Interest in Adjudicating this Dispute

Defendant has improperly filed two DMCA Notifications in California, the result of which (e.g., the take down of its product) has and will negatively affect Plaintiff, a California company. Any impact on a California corporation necessarily impacts the State. California therefore has a substantial interest in adjudicating this case. *Tuazon v. R.J. Reynolds*, 433 F.3d at 1176 (state takes full interest in well-being of its residents).

### e)   The Most Efficient Judicial Resolution of the Controversy and the Importance of the Forum to Plaintiff's Interest in Convenient and Effective Relief

The site where the injury occurred and where the evidence is located is usually the most efficient forum. *Tuazon v. R.J. Reynolds*, 433 F.3d at 1176. Here, the most efficient forum to resolve this controversy is California – where: 1) the improper DMCA Notification was filed; 2) the alleged copyright infringement took place; 3) the Horse Product Line and the "virtual bunnies" are sold; 4) the threatened take down will occur on Linden Research's servers; 5) Plaintiff has been harmed; 6) Plaintiff and Linden Research reside; and 7) the witnesses and evidence are located. Thus, the most convenient and efficient place to litigate this claim is therefore California.

### f)   There Is No Alternate Forum

The only proper forum is in the State of California, where Plaintiff and Linden Research reside. Plaintiff has no contacts with the State of Alabama, where Defendant resides.

Accordingly, this Court has general jurisdiction over Defendant.

### B.   This Court Has Specific Jurisdiction over Defendant

In addition to general jurisdiction, this Court has specific jurisdiction over Defendant. In the Ninth Circuit, courts analyze specific jurisdiction according to a three prong test: 1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof, or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; 2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and 3)

9

1  the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be

2  reasonable.  *YAHOO! Inc. v. La Ligue Centre Le Racisme Et L'Antisemitisme*, 433 F. 3d 1199, 1205-

3  1206 (9th Cir. 2006).  All three prongs are met.

### 1.     The Purposeful Availment Prong Is Satisfied

5        The first prong may be satisfied by purposeful availment of the privilege of doing business in

6  the forum, by purposeful direction of activities, or by some combination thereof.  *YAHOO! Inc. v. La*

7  *Ligue Centre Le Racisme Et L'Antisemitisme*, 433 F. 3d at 1206.  In tort cases, the court inquires

8  whether a defendant "purposefully directs[s] his activities" at the forum state, applying an "effects"

9  test that focuses on the forum in which the defendant's actions were felt, whether or not the actions

10  themselves occurred within the forum.  *Id*. (*Citing to Calder v. Jones*, 465 U.S 783, 789-90 (1984)).

11  The *Calder* "effects" test imposes three requirements: that the defendant allegedly 1) committed an

12  intentional act; 2) expressly aimed at the forum state; and 3) causing harm that the defendant knows

13  is likely to be suffered in the forum state.  *YAHOO! Inc. v. La Ligue Centre Le Racisme Et*

14  *L'Antisemitisme*, 433 F. 3d at 1206 (citation omitted). The court must analyze all of the defendants'

15  contact with the forum state, irrespective of whether they involve wrongful actions by Defendant.

16  *Id.* at 1208.  These three elements in this first prong have been met, and Defendant has purposefully

17  availed itself of the privilege of doing business in this forum and directing its activities there.

18        First, as argued above, Defendant has entered into a contractual relationship with Linden

19  Research so that it may sell or license its "virtual bunnies" in Second Life.  In fact, its entire business

20  model centers upon and is dependent upon this business relationship.  It is through this business

21  relationship that Defendant filed its DMCA Notifications – the subject matter of this instant lawsuit.

22        Second, Defendant served a cease and desist letter to Plaintiff claiming that its Horse Product

23  Line infringes upon the alleged copyright of its "virtual bunny," both of which are sold in Second

24  Life.  Defendant demanded that Plaintiff take down its product from Second Life or it would be

25  forced to "enforce its intellectual property rights…"  (Compl., Ex. 3).   Plaintiff felt the effect of this

26  threat in California where it resides.

27        Defendant also served two DMCA Notifications on Linden Research (located in California)

28                                          10

1  for the express and intentional purpose of triggering Second Life's DMCA policy and shutting down

2  Plaintiff's Horse Line Product from Second Life.   Linden Research intends to take down Plaintiff's

3  product by the close of business, December 21, 2010.

4         Finally, Defendant claims that the sale of Plaintiff's products in Second Life infringes upon

5  the alleged copyright of Defendant's virtual bunny.  This alleged infringing activity has necessarily

6  occurred in California, where Second Life is located.

7         The courts have held that cease and desist letters, threats of litigation, and "DMCA-like"

8  notifications can be the basis for personal jurisdiction in certain circumstances.   *YAHOO! Inc. v. La*

9  *Ligue Centre Le Racisme Et L'Antisemitisme*, 433 F. 3d at 1206 (citing to *Bancroft & Masters*, 223

10  F.3d 1082, 1087 (9th Cir. 2000)); *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063,

11  1080 (10th Cir. 2008).  For example, in *Bancroft*, defendant, based in Georgia, sent a letter to

12  Network Solutions, Inc. ("NSI"), the sole registrar based in Virginia, claiming that plaintiff was

13  improperly using its domain name, and a cease and desist letter to plaintiff at its offices in

14  California.  Plaintiff sued defendant seeking declaratory judgment that it had the right to the disputed

15  domain name.  The Ninth Circuit found that jurisdiction in California was appropriate because the

16  letters were intended to trigger NSI's dispute resolution procedures, to interfere wrongfully with

17  plaintiff's use of the domain name, and to misappropriate that name for defendant's own use.

18  *Bancroft & Masters*, 223 F.3d at 1087.

19         In *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, *supra*, defendant notified eBay in

20  California that plaintiff was infringing upon its copyrighted work, which resulted in the successful

21  suspension of plaintiffs' auction (under procedures similar to the DMCA).  Defendant also

22  threatened plaintiffs with a lawsuit.  In response, plaintiffs filed a declaratory relief action in

23  Colorado, where they resided, claiming that their products do not infringe upon defendant's

24  copyright.  The Tenth Circuit held that jurisdiction in Colorado was proper, because among other

25  things, defendants threatened litigation and affirmatively interfered with plaintiffs' business in

26  Colorado.  514 F.3d at 1080.

27         Here, Defendant's conduct has been intentional and expressly aimed at this forum.  As a

28

result of the improper DMCA Notifications, Plaintiff has and will continue to be harmed in this

forum state of California – which Defendant is acutely aware.  Customers are now afraid to buy any

horses from the Plaintiff and/or its vendors, because of the fear that the Horse Product Line might be

taken down.  (*See* declarations filed in support of Motion for Temporary Restraining Order; e-docket

12-17).   If the Horse Line Products are in fact taken down, when Linden Research has confirmed it

will do by the close of business December 21, 2010, Plaintiff's reputation and business will be

ruined.  Thus, Defendant's conduct has had substantial "effects" in California.  (*Id.*)   *See e.g., Dole*

*Food Co., Inc. v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002)(the location of a corporation's

economic injury is its headquarters).

**2.      The Claim Arises out of Defendant's Forum-Related Activities**

The claims in this lawsuit specifically arise out of Defendant's forum-related activities.

Plaintiff alleges that Defendant has knowingly filed a DMCA Notification in California which notice

contains material misrepresentations that Plaintiff's products infringe upon Defendant's alleged

copyrights in its products – both of which are sold in Second Life.  The purpose for filing the DMCA

Notifications is to shut down Plaintiff's products from Second Life, and ultimately, shut down

Plaintiff's California business.  That conduct has and will continue to cause it irreparable harm and

monetary damages to Plaintiff in California.  Even a single forum state contact can support

jurisdiction if the cause of action arises out of that particular purposeful contact of the defendant

with the forum state.  *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987).  This prong has been

satisfied.

**3.      The Exercise of Jurisdiction Comports with Fair Play and Substantial
          Justice**

As set forth in detail above, Plaintiff has established that the exercise of jurisdiction is

reasonable and comports with fair play and substantial justice.  Accordingly, this Court has specific

jurisdiction over Defendant.

**IV.      PLAINTIFF HAS NOT FILED AN "ANTICIPATORY CLAIM"**

During the December 20, 2010 hearing, Defendant's counsel argued that Plaintiff's

declaratory judgment claim is nothing more than an anticipatory lawsuit involving a supposed

12

affirmative defense over which this Court has no jurisdiction.  Defendant is wrong.  This case involves an affirmative claim under section 512(f) which is ripe and gives rise to Plaintiff's request for injunctive relief.

In applying the "first-to-file" rule, the court analyzes three factors: 1) the chronology of the two actions; (2) the similarity of the parties; and 3)  the similarity of the issues.  *Palantir Technologies, Inc. v. Palantir.net, Inc.*, 2007 WL 2900499, *1 (N.D. Cal. 2007) (citation omitted). The courts recognize an exception to this rule if the plaintiff has 1) filed an anticipatory suit; 2) acted in bad faith, or 3) engaged in forum shopping.  *Id.* (citation omitted).  "A suit is anticipatory when the plaintiff filed upon receipt of a specific, concrete indications that a suit by defendant was imminent."  *Id.* (citation omitted).  The exceptions do not apply in this case.

First, Plaintiff has not filed a anticipatory lawsuit.  Plaintiff is not seeking only a declaratory judgment in its complaint as was the scenario in the two cases cited by Defendant during the December 20, 2010 hearing, *Pacific Bell Internet Services v. Recording Industry Assoc. of America, Inc.*, 2003 WL 22862662 (N.D. Cal. 2003) and *Global Innovations, Inc. v. ALS Scan, Inc.*, 125 Fed. Appx. 782 (9th Cir. 2005).  Those cases are not applicable here because the complaints in those lawsuits alleged <u>only</u> a declaratory judgment claim. They did not assert any independent causes of action seeking damages, as Plaintiff has done here.  Plaintiff is seeking affirmative relief under 17 U.S.C. § 512(f), among other tort claims.  Section 512(f) specifically allows a party who has been wrongly accused of copyright infringement and is the subject of a "take-down" notice, to bring a claim against the accuser for damages, including costs and attorney's fees incurred by the alleged infringer.  *Id.*  Contrary to Plaintiff's suggestion, this claim is not an affirmative defense.  It is a direct and affirmative claim which Plaintiff has against Defendant.  The cases cited by Plaintiff are also distinguishable because they do not involve section 512(f) of the DMCA.

Second, Plaintiff is not acting in bad faith.  If Plaintiff does not immediately act on its 17 USC § 512(f) claim, Linden Research will take down all its product from Second Life leaving Plaintiff without any recourse – which essentially would be an injunction without due process. Section 512(f) levels the playing field so that a copyright accuser such as Defendant cannot run

13

1   amuck and abuse the DMCA take down procedures.   The filing of this lawsuit is simply to prevent

2   any further damage to Plaintiff's reputation and good will.

3        Third, Plaintiff is not forum shopping.  As set forth in detail above, the only reasonable and

4   appropriate venue is in California where Defendant does business and has consented to jurisdiction;

5   where Defendant claims the alleged copyright infringement occurred; where the wrongful filing of

6   the DMCA Notification occurred; and where Plaintiff and Linden Research reside.  Alabama does

7   not have personal jurisdiction over Plaintiff.

8   **V.   PLAINTIFF'S SUIT DOES NOT VIOLATE DEFENDANT'S FIRST AMENDMENT RIGHTS.**

9

10       In a further effort to delay this Court's decision on the requested temporary restraining order,

11  Defendant has raised the specter of a violation of its right to petition pursuant to the First

12  Amendment.  Plaintiff seeks redress for Defendant's misuse of the DMCA pursuant to a statute that

13  expressly provides a cause of action for misuse of the DMCA.  Despite that, Defendant has

14  "argued"[4] that the *Noerr-Pennington* doctrine should be applied so as to preclude Plaintiff's cause

15  of action for misrepresentation pursuant to the DMCA, a cause of action Congress expressly

16  included in that statue.  Defendant's argument is misguided.

17       As this Circuit has recognized, the *Noerr-Pennington* doctrine is best understood as a rule of

18  statutory construction, whereby a statute invoked by the plaintiff is to be applied so as not to burden

19  conduct of the defendant that is protected by the Petition Clause.  *Sosa v. DirecTV, Inc.*, 437 F.3d

20  923, 931 (9th Cir. 2005) ("*Sosa*").  Thus, in this case, Defendant appears to contend that Plaintiff

21  cannot maintain an action for violation of 17 U.S.C. section 512(f) ("fraudulent DMCA action")

22  predicated on Defendant's issuance of a misleading notice pursuant to 17 U.S.C. section 512(c)(3)

23  ("DMCA take down notice") because Defendant's notice is protected by the Petition Clause.

24       The *Sosa* decision sets forth a three step analysis for determining whether a given statute

25  ─────────────────

26  [4]  Defendant's argument is a matter of speculation at this point, given that Defendant has not filed an Opposition to Plaintiff's request for a TRO, but has chosen instead during the hearing on the TRO to

27  make vague references to potential "stoplights" that may or may not impact this Court's decision. Nonetheless, Defendant's reference to the *Sosa* decision seems to suggest how its argument will

28  proceed.

14

imposes liability on a defendant for conduct protected by the Petition Clause: (1) identification of the burden imposed on Defendant's protected communications by plaintiff succeeding in its lawsuit; (2) identification of a protected petitioning activity; and (3) determination of whether the statute can be construed to preclude burdening a protected petitioning activity . *Id.* at 390, citing *BE & K Construction Co. v. NLRB*, 536 U.S. 516, 529-537 (2002) ("*BE & K Construction*").   Application of that analysis to this action establishes that Defendant has not engaged in protectable conduct and that Plaintiff's allegation of misrepresentation pursuant to section 512(f) pass muster under the *Noerr-Pennington* doctrine.   Consequently, the Petition Clause is not a bar to Plaintiff's action.

### A.    Plaintiff's Action Does Not Burden any Protected Conduct.

Plaintiff can only prevail on its DMCA cause of action if it proves that Defendant "knowingly materially misrepresented" that Plaintiff's products were infringing when Defendant issued its DMCA take down notice.  17 U.S.C. § 512(f)(1).  Thus, the threshold question in the *Sosa* analysis is whether such an outcome would burden any of Defendant's petitioning rights.  It would not.

The outcome of Plaintiff's successful action is that Defendant would be liable for damages stemming from its misrepresentations and for Plaintiff's attorney's fees and costs.  *Id.*  Unlike *BE & K Construction*, there will be no finding that a lawsuit – or other petition to another branch of government – is illegal or impermissible.  *BE & K Construction Co,* 536 U.S. at 530.  A finding in favor of Plaintiff will not, in itself, prevent Defendant from maintaining an infringement action against Plaintiff.[5]  Further, there is no "reputational harm" that would stem from such an outcome that is somehow "different and additional" to the damages and attorney's fee award.  *Id.*

Likewise, should Plaintiff prevail, there will be no impact on Defendant's "ability to settle legal claims short of filing a lawsuit," as was the case in *Sosa*.  *Sosa*, 437 F.3d at 932-933.  The letters sent by DirecTV in *Sosa* were sent to the alleged wrongdoer and were, in fact, offers to settle claims that DirecTV purported to have against the individual.  *Id.* at 926-927, fn. 1.  By contrast,

---

[5] Of course, there would likely be other hurdles to overcome in such an action, such as collateral estoppel, res judicata, and FRCP Rule 11.

15

1   DMCA take down notices are not efforts to "settle legal claims;" they are attempts to summarily

2   enjoin an alleged infringer from conduct that the purported copyright holder – in its sole discretion –

3   deems impermissible.  They do not require any showing of any kind by the party giving notice; they

4   do not even require notice to the alleged infringer, let alone an opportunity to respond prior to the

5   alleged infringing material being "taken down."  *See* 17 U.S.C. § 512(c)(3).  In short, there is no

6   "settlement" of any kind anticipated by or communicated with such a notice.

7        Moreover, even should Plaintiff prevail, there will be no impact on Defendant's ability to

8   send out additional DMCA take down notices.  If anything, Defendant's practice of sending such

9   notices will be improved by virtue of having learned what constitutes a meritorious notice compliant

10  with 17 U.S.C. section 512(c)(3).  In sum, Plaintiff's lawsuit will have no bearing any conceivable

11  activity by Defendant that might fall under the Petition Clause.

12        **B.        A DMCA Take Down Notice is Not Protected Conduct.**

13        However, even if this Court should identify some arguable burden that the threat of

14  Plaintiff's fraudulent DMCA claim imposes on Defendant's petitioning rights, the burden on the

15  precise petitioning activity at issue does not implicate the Petition Clause.  The only activity of

16  Defendant's that Plaintiff addresses is the one called out in 17 U.S.C. § 512(f) – Defendant's DMCA

17  take-down notice.  That notice is not sent to a court of government agency of any kind, but rather to

18  a private, third-party who hosts the alleged infringing content – in this case Linden Research, Inc.,

19  the makers and hosts of Second Life.  Thus, there can be no dispute that a DMCA take down notice

20  is not a protected petition.  *See Sosa*, 437 F.3d at 933.

21        Further, sending a DMCA take down notice is not activity "which must be protected to afford

22  breathing space to the right to petition guaranteed by the First Amendment."  *Id*.  The "breathing

23  space principle" protects both speech that itself would not merit protection but must be accorded it to

24  "fully vindicate the free speech rights guaranteed by the First Amendment" (e.g. false statements

25  made without malice) as well as conduct necessary to exercise the actor's free speech (e.g., political

26  campaign donations).  *Id*.  DMCA take-down notices fall into neither category.

27        In the context of the Petition Clause, the breathing space principle extends protection beyond

28                                                    16

the "petitions sent directly to the court in the course of litigation to 'conduct incidental to the prosecution of the suit.'" *Id.* at 934, citing *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.,* 944 F.2d 1525, 1528-29 (9th Cir.1991) ("*PRE I*"), *aff'd* 508 U.S. 49 (1993).  Both *PRE I* and *Sosa* extend protection to pre-litigation offers of settlement, while *Freeman v. Lasky, Haas & Cohler,* 410 F.3d 1180 (9th Cir.2005) extended protection to private communications related to discovery occurring during litigation.  However, no court has determined that communications to a third-party made outside of any actual or threatened litigation falls within the reach of *Noerr-Pennington* and there is no reason to make a DMCA take down notice the first such communication.

As noted above, a DMCA take down notice is not even sent to the alleged infringer nor does it offer that person any opportunity to avoid the removal of the alleged infringing content.  *See* 17 U.S.C. § 512(c)(3).  It does not threaten a lawsuit nor offer a means of avoiding one.  *Id.*  It is not a necessary predicate to filing any sort of legal action by the alleged copyright holder, and cannot be said to "impair the right of access to the courts protected by the First Amendment."  *Sosa*, 437 F.3d at 936.  In fact, the only legal action stemming from or predicated upon a DMCA take down notice is the one Plaintiff is currently pursuing – the fraudulent DMCA action authorized by 17 U.S.C. § 512(f).

In *Sosa*, the Ninth Circuit identifies several reasons for extending protection to pre-lawsuit communications.  *Sosa*, 437 F.3d at 936.  None of them apply here.  A DMCA take down notice does not serve as "an invitation to engage in negotiation to settle legal claims" (*id.*); rather, its summary procedure is an abject refusal to negotiate.  Likewise, the absence of any requirement that the notice provide a basis for the allegations of infringement does nothing to "streamline" subsequent litigation.  *Id.*

DMCA take down notices are not privileged like prelitigation communications might be.  *Id.*  Thus, there is no reason to assume any "intimate" connection between such notices and "the actual litigation process."  *Id.*

Further, extending immunity to DMCA take down notices does not serve to legitimize the judicial process in any fashion.  *See id.*  A DMCA take down notice is the definition of "self-help;" it

17

1   effectively enjoins an alleged infringer without the due process afforded by a legal proceeding.

2   Sending a DMCA take down notice is the anti-thesis to seeking legal recourse and provides for none

3   of the tangible and intangible benefits stemming from the "'public airing of disputed facts'" that the

4   *Noerr-Pennington* doctrine is intended to protect.  *Id.*, quoting *Bill Johnson's Restaurants, Inc. v.*

5   *N.L.R.B.*, 461 U.S. 731, 743 (1983).

6          Finally, extending *Noerr-Penningtion* immunity to DMCA take down notices is in accord

7   with neither Supreme Court precedent nor decision in other Circuits.  Instead, withholding immunity

8   is consistent with the Supreme Court's decision in *Allied Tube & Conduit Corp. v. Indian Head*,

9   *Inc.*, 486 U.S. 492 (1988).  In *Allied Tube*, the Court found that efforts to lobby a private

10  association's product standards were not immunized by the *Noerr-Pennington* doctrine and thus

11  could serve as the basis for antitrust liability.  In so finding, the Court stated that "petitioner does not

12  enjoy the immunity accorded those who merely urge government to restrain trade" because where a

13  private organization is asked to act, "the restraint is imposed by persons unaccountable to the public

14  and without official authority who have a personal financial interest in restraining competition."  *Id.*

15  at 501-502.

16         Similarly, Defendant's DMCA take down notice is not incident to a lawsuit for infringement,

17  but is instead a demand that Linden Research, Inc. – a private entity that is in partnership with

18  Defendant to promote and sell the very product Defendant is alleged to infringe (*see* Kearns Decl., ¶

19  6, Ex. E) – exert its authority over Plaintiff to remedy the supposed infringement.  Such conduct is

20  purely a private action in the commercial realm and is not an effort to petition any governmental

21  body for redress.

22         **C.     Defendant's DMCA Notice is a "Sham" and thus not Entitled to Protection.**

23         Nonetheless, should this Court find that a DMCA notice is the sort of conduct meriting

24  protection under the Petition Clause, Defendant's particular DMCA take down notice at issue in this

25  action is subject to the "sham" exception to *Noerr-Pennington* and thus is unprotected.  The Ninth

26  Circuit has identified three circumstances giving rise to the "sham" exception.  *See Kottle v.*

27  *Northwest Kidney Centers*, 146 F.3d 1056, 1060 (9th Cir. 1998).  Where the alleged petitioning

28

18

1   activity is not a petition itself, but rather conduct incidental to a petition, it may be deemed a "sham"

2   if it is both objectively baseless and brought for an anticompetitive purpose.  *Sosa,* 437 F.3d at 938;

3   citing *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60-61

4   (1993) ("*PRE II*").  Plaintiff has alleged that Defendant's conduct satisfies both elements.

5          While the circumstances surrounding Defendant's potential invocation of the *Noerr-*

6   *Pennington* doctrine remain unclear, presumably they intend to do so in a motion to dismiss.  In so

7   doing, Plaintiff's allegations must be assumed to be true.  *See Kearney v. Foley & Lardner, LLP,* 590

8   F.3d 638, 646 -647 (9th Cir., 2009) (finding allegations of Complaint sufficient to state sham

9   exception to *Noerr-Pennington* doctrine).  In its Complaint, Plaintiff has detailed the reasons why

10  Defendant's allegations of infringement are unfounded and alleged that Defendant "knowingly and

11  materially misrepresented" that Plaintiff infringed its copyright and that Defendant's actions were

12  those of a "competitor…designed to permanently injure Plaintiff's business and reputation" and to

13  interfere "in the lawful sale of Plaintiff's products."  *See e.g*., Compl. (e-docket 1), ¶¶ 17-29, 38-42.

14  Thus, Plaintiff's properly alleges that Defendant's DMCA take down notice was a "sham" for the

15  purposes of determining application of the *Noerr-Pennington* doctrine and will withstand

16  Defendant's attempt to dismiss on those grounds.

17          **D.     An Action Pursuant to the DMCA is Constitutional.**

18          Finally, all of the foregoing notwithstanding, should this Court reach the final element of the

19  *Sosa* analysis – requiring determination whether the DMCA must be construed to reach conduct

20  protected by the Petition Clause or if it can be construed more narrowly – it will still find the *Noerr-*

21  *Pennington* doctrine to inapplicable to the matter at bar.  Under this prong of the analysis, the court

22  must attempt to construe the DMCA so as not burden petitioning conduct and thus run afoul of the

23  Petition Clause.  The DMCA as written and as applied by the Ninth Circuit is readily susceptible to

24  such an interpretation.

25          The DMCA allows for suit predicated not simply on an erroneous take down notice or when

26  allegations of copyright infringement are subsequently defeated in court.  Section 512(f) provides for

27  liability only in the event that Defendant "knowingly materially misrepresented" that Plaintiff's

28

products were infringing.  The Ninth Circuit has interpreted "knowingly" to require not an objective "knew or reasonably should have known" standard, but rather a subjective mental state of actual knowledge.  *See Rossi v. MPAA*, 391 F.3d 1000 (9th Cir. 2004).  Thus, as 17 U.S.C. section 512(f) is understood in this Circuit, it applies a more stringent standard than that required to meet the sham exception of the *Noerr-Pennington* doctrine.  According to *PRE II*, a plaintiff would only need to allege an objectively baseless claim.  A standard of objective misrepresentation, which allows recourse to what the defendant reasonably should have known, is indisputably less stringent than a standard requiring subjective misrepresentation, whereby the defendant must have actual knowledge of the baseless nature of its claims.

Consequently, the DMCA can be read to allow Plaintiff to pursue only those actions that do not impose upon Defendant's right to petition – assuming that an action for issuing a fraudulent DMCA take down notice even implicates that right.  Further, as noted above, Plaintiff's Complaint adequately pleads Defendant's "knowing" misrepresentation of infringement, consistent with both the requirement of the DMCA and the "sham" exception to the *Noerr-Pennington* doctrine.

## VI.    A BOND OF $10,000 IS APPROPRIATE

This Court has also requested briefing regarding the amount of bond to be posted for the TRO.  A bond of $10,000 is appropriate in this case.  Fed.R.Civ.P. 56(c) provides that a successful movant for a TRO must post security "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."  The amount of the bond, however, is left to the court's discretion.  *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2002).  Generally, the amount of the bond required prior to issuance of a TRO should be sufficient to protect the restrained party from loss actually and proximately caused from the issuance of a wrongful TRO, between the time the TRO is issued and the preliminary injunction hearing.  *See Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982) (holding that a bond should be sufficient "to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully.").

In this case, if the Court issues a temporary restraining order, Plaintiff will be permitted to

20

continue to sell its Horse Product Line between the date the TRO issues and January 12, the date of the preliminary injunction hearing.  However, there is no evidence that Plaintiff's continued sales during this 3-4 week period will divert from Defendant any sales of their virtual bunny products.  In fact, the two products are simply too dissimilar to conclude that any decrease in sales of Defendant's virtual bunny products  could be actually and proximately caused by the issuance of the TRO.  There is no evidence that individuals in Second Life who buy, breed and resell virtual horses would instead by Defendant's virtual bunnies.  In fact, the declarations of actual purchasers of horses confirm that they are permanently and deeply committed to their horses and have no desire to buy and breed any other virtual pets.  (e-docket 13, 14, 16, 17).

In addition, Defendant waited several months before taking any action against Plaintiff, and only now just filed a lawsuit (in Alabama).  Certainly Defendant had not been significantly damaged by Plaintiff's sale of its Horse Product Line, nor do they believe that they are suffering any such damage.  Thus, the $10,000 amount suggested by Plaintiff is appropriate.  It is not an insignificant amount and accurately reflects the minimal harm which Defendant might suffer. Similar amounts have bee approved in similar situations.  *See e.g., Chanel Inc. v. Paley*, C-09-4979MHP (N.D. Cal.), Order granting TRO (e-docket 18); *Affliction Holdings v. Simon Chen*, C-10-0933VRW (N.D. Cal.), Order granting TRO (e-docket 21).

## VII.    CONCLUSION

As set forth above, this Court has personal jurisdiction over Defendant and the *Noerr-Pennington* Doctrine is not a bar to Plaintiff's claims.  Accordingly, this Court should issue a temporary restraining order against Defendant immediately.

Dated:  December 21, 2010                    KRIEG, KELLER, SLOAN, REILLEY & ROMAN LLP

By: _____/S/_____
KENNETH E. KELLER
Attorneys for Plaintiff Amaretto Ranch Breedables, LLC

21

106281