IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMARETTO RANCH BREEDABLES, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>OZIMALS, INC, et al.,<br><br>    Defendants.      / | No. C 10-05696 CRB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** |

This is a copyright case between business competitors who sell virtual animals in the virtual world known as Second Life. The case started when Plaintiff Amaretto Ranch Breedables filed a Complaint and sought a temporary and preliminary restraining order preventing Linden Research, Inc. from removing Amaretto's virtual horse product line from the Second Life world in response to a Digital Millennium Copyright Act ("DMCA") Takedown Notification sent to Second Life by Defendant Ozimals, Inc. This Court granted Amaretto's request for a TRO and ultimately issued a preliminary injunction requiring Ozimals to withdraw all DMCA Takedown Notifications from Second Life and to file no further notifications.

Presently before the Court is Ozimals's Motion to Dismiss the Second through Fifth causes of action in Amaretto's First Amended Complaint ("FAC").[1] Dkt. 72. Specifically,

---

[1] Ozimals does not move to dismiss Amaretto's cause of action for declaratory judgment.

Ozimals moves to dismiss Amaretto's claims for (1) misrepresentation under 17 U.S.C. § 512(f); (2) tortious interference with prospective business advantage; (3) unfair competition under California Business and Professions Code § 17200; and (4) misuse of copyright under 17 U.S.C. § 102(B).

Ozimals's Motion is GRANTED in part and DENIED in part.  Specifically:

- • The section 512(f) claim is DISMISSED with prejudice.
- • The tortious interference with contract claim is DISMISSED without prejudice.
- • The Motion to Dismiss is DENIED in all other respects.
- • The Preliminary Injunction shall REMAIN IN EFFECT.

## I.     BACKGROUND[2]

Second Life is a virtual world operated by Linden.  FAC (dkt. 68) ¶ 15.  Users can create three dimensional environments through the use of tools offered by Linden.  Id. ¶ 16.  One such tool is the Linden Scripting Language ("LSL"), a universal coding language used to add functionality to virtual objects.  Id.  Linden owns the copyright to LSL.  Id.

Creators of virtual objects can set "permissions" that allow varying degrees of interaction and/or alteration of an object.  Id. ¶ 17.  Setting "permissions" at the proper level is important because many creators sell their objects in virtual stores in Second Life for real world currency.  Id. ¶ 18.

One type of popular user-created object sold in Second Life is the breedable animal. Id. ¶ 19.  Essentially, these objects mimic the life cycle of a real animal; they eat to survive, sleep, and replicate.  Id.  Amaretto created a breedable horse and associated virtual horse food, both of which it sells in Second Life.  Id. ¶ 20.  Amaretto competes in the market of virtual animal sellers with Ozimals, which owns and sells virtual breedable bunnies.  Id. ¶ 22-23.

In early November 2010, Ozimals sent Amaretto a "cease-and-desist" letter alleging that (1) Amaretto's virtual horses were a "virtual clone" of Ozimals's virtual bunnies and (2)

---

[2] As this case comes before the Court on a motion to dismiss, the facts are set forth in the light most favorable to Amaretto and drawn from the FAC and judicially noticeable materials.

Amaretto was infringing Ozimals's copyrights.  Id. ¶ 23.  The assertions in the cease-and-desist letter were false.  See id. ¶ 23-24.  Ozimals made similar false statements to "other members of the Second Life community."  Id. ¶ 25.  Amaretto responded to Ozimals's cease-and-desist letter in late November 2010, asserting that it was not and could not be infringing any valid copyrights.  Id. ¶ 26.

On December 1, 2010, Ozimals filed with Linden a DMCA Takedown Notification pursuant to 17 U.S.C. § 512(c)(3).  Id. ¶ 27.  The Notification sought, among other things, the removal from Second Life of Amaretto's virtual "food" and "water."  Had the takedown occurred, the virtual horses would have "died" from "starvation" and/or "thirst" within 72 hours.  Id. ¶ 28.  A takedown would have caused a significant disruption in Amaretto's business during a critical selling season.  Id. ¶ 33.

Among other actions in response to the DMCA Takedown Notification, Amaretto eventually sought and obtained from this Court preliminary relief in the form of an injunction requiring Ozimals to withdraw all pending DMCA notifications concerning Amaretto's horses.  Id. ¶ 32; see also Dec. 21, 2010 Order (dkt. 29); Jan. 7, 2011 Order (dkt. 49).  Meanwhile, Ozimals filed a copyright infringement action against Amaretto in the United States District Court for the Northern District of Alabama on December 20, 2010.  See Complaint (dkt. 1) Ozimals v. Amaretto Ranch Breedables, LLC, 2:10 cv-03520-KOB.  That Complaint has not been served.

At the Court's direction, the parties engaged in preliminary discovery designed to determine whether Amaretto copied Ozimals's code when Amaretto created the virtual horses.  It was the Court's hope that early exchange of code might shed light on the merits of Ozimals's allegation that Amaretto violated its copyrights and perhaps facilitate early resolution of this and the related copyright infringement action in Alabama.  The parties exchanged that discovery.  Although it appears that they agree that no literal copying occurred, they disagree as to whether nonliteral copying occurred.  See Joint Case Management Statement (dkt. 70) at 15 ("The Sylint Group [(Ozimals's expert)] did not find wholesale copying of the written source code from among the files it examined.  Instead, The

Sylint Group found Ozimals code produced certain traits, while Plaintiff's code produced the same traits using a different set of written code.").

Ozimals has now moved to dismiss each of Amaretto's claims other than its claim for declaratory relief.[3] As mentioned above, those claims are for (1) misrepresentation under 17 U.S.C. § 512(f); (2) tortious interference with prospective business advantage; (3) unfair competition under California Business and Professions Code § 17200; and (4) misuse of copyright under 17 U.S.C. § 102(B).

## II. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in a complaint. Ileto v. Glock, Inc., 349 F.3d 1191, 1199-2000 (9th Cir. 2003). Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." "Detailed factual allegations" are not required, but the Rule does call for sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937. 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007)). According to the Supreme Court, "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949-50. Whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950.

## III. DISCUSSION

### A. The Section 512(f) Misrepresentation Claim Is Not Viable Because No Takedown Occurred

Section 512(f) provides in pertinent part as follows.

> Any person who knowingly materially misrepresents under this section – (1) that material or activity is infringing . . . <u>shall be liable for any damages</u>, including costs and attorneys' fees, <u>incurred by the alleged infringer</u>, by any copyright owner or copyright owner's

---

[3] Amaretto's claim for declaratory relief seeks a declaration "that its products do not infringe [Ozimals's] alleged copyrights, or any other exclusive rights that [Ozimals] might assert under state or federal law, and that Defendants copyrights are not valid or enforceable." FAC (dkt. 68) ¶ 39.

4

> authorized licensee, or by a service provider, <u>who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing</u> . . . .

17 U.S.C. § 512(f) (emphasis added).

Ozimals argues that, because Linden never removed the horses from Second Life, Amaretto cannot have been "injured . . . <u>as the result of the service provider . . . removing or disabling access to the material</u> . . . claimed to be infringing." <u>Id.</u> (emphasis added); Mot. to Dismiss (dkt. 72) at 4-5; <u>see also</u> <u>Lenz v. Universal Music Corp.</u>, No. C. 07-3783 JF, 2010 WL 702466 at *10 (N.D. Cal. Feb. 25, 2008) ("A fair reading of the statute, the legislative history, and similar statutory language indicates that a § 512(f) plaintiff's damages must be proximately caused by the *misrepresentation to the service provider and the service provider's reliance on the misrepresentation*.") (emphasis in original).

Amaretto argues that applying section 512 as written and thereby excluding claims where, as here, no takedown occurred, is inconsistent with the legislative purpose of "deter[ing] knowingly false allegations to service provides in recognition that such misrepresentations are detrimental to the rights holders, service providers, and Internet users." S. Rep. 105-190, May 11, 1998 at 49; Opp'n to Mot. to Dismiss (dkt. 74) at 3. Amaretto is right that limiting suits for damages to those caused by an actual takedown is a less effective deterrent than allowing suits based merely on the filing of a false Takedown Notification. But the statute is unambiguous in entitling an alleged infringer to damages caused "as the result of the service provider . . . removing or disabling access to the material . . . ." 17 U.S.C. § 512(c). Moreover, that limitation does not create so perverse a result as to suggest that this Court ought to read the phrase "as the result of the service provider . . . removing or disabling access" out of the statute. See <u>Lenz</u>, 2010 WL 702466 at *10 (quoting Quilter & Urban, <u>Efficient Process or "Chilling Effects"? Takedown Notices Under Section 512 of the Digital Millennium Copyright Act</u>, 22 SANTA CLARA COMPUTER & HIGH TECH. L.J. 621, 631 (2006) ("The alleged infringers are to be protected from mistaken takedowns and misuse of this rather remarkable extra-judicial process principally through a counternotice procedure . . . . [T]he vast majority of § 512 notices likely are never subject to

the scrutiny of a court. In part, this was precisely the point behind § 512: the efficient removal of infringing materials from the Internet in a fair process, with (in most cases) no need for court review.").

Amaretto attempts to distinguish Lenz in two primary ways. Although both distinctions exist, they do not justify ignoring the plain language of section 512(c) limiting damages to those caused by an actual takedown.

First, Amaretto points out that, in Lenz, the plaintiff did not dispute the existence of a valid copyright. Opp'n to Mot. to Dismiss (dkt. 74) at 4. But this is a distinction that fails to create a meaningful difference. The plaintiff in Lenz argued that, notwithstanding the existence of a valid copyright, the Takedown Notification at issue in that case was still flawed under section 512 because the plaintiff was engaged in fair use. Second Am. Compl., 07-3783-JF ¶ 34 ("Lenz's use of the Prince song 'Let's Go Crazy' is a self-evident non-infringing fair use under 17 U.S.C. § 107."). Thus, in both Lenz and here, the plaintiff is contesting the validity of the Takedown Notification.

Second, Amaretto notes that, unlike in Lenz, this case involves one competitor issuing a Takedown Notification directed toward another competitor. Opp'n to Mot. to Dismiss (dkt. 74) at 4. Although Amaretto's concerns about the anti-competitive use of Takedown Notifications seem legitimate, if Congress wanted to carve out an exception from the damage limitation in section 512 for claims by business competitors it could have done so.

Thus, this Court dismisses Amaretto's section 512 claim with prejudice because no takedown occurred.

### B. As Pleaded, the Litigation Privilege Does Not Bar the Tortious Interference and Unfair Competition Claims

Ozimals argues that California's litigation privilege bars Amaretto's claims because they are based on protected litigation activity – namely, Ozimals's cease-and-desist letter, Takedown Notifications, and publications about those activities. Mot. to Dismiss (dkt. 72) at 4-5; see also Cal. Civ. Code § 47. Amaretto makes two arguments against application of the litigation privilege. First, that it does not apply in federal court. Second, that, even if it does

1 apply in federal court, Ozimals's communications here are not protected. Amaretto's second
2 argument is persuasive.

### 1. The Litigation Privilege Can Bar Pendent State Law Claims

Amaretto cites <u>Religious Technology Center v. Wollersheim</u> for the proposition that the litigation privilege does not apply in federal question cases with pendent state law claims. 971 F.3d 364, 367 n.10 (9th Cir. 1992) ("[I]n federal question cases, the law of privilege is governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience."). But <u>Religious Technology Center</u> stands for the uncontroversial rule that California's litigation privilege does not apply to <u>federal</u> claims. It does not stand for the proposition that the litigation privilege does not apply to pendent <u>state</u> claims. <u>Id.</u> Moreover, California's litigation privilege is not an evidentiary privilege. Rather, it is an immunity under California law from liability for certain types of conduct. <u>Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.</u>, 42 Cal. 3d 1157, 1168 (1986) ("The privileges of Civil Code section 47, <u>unlike evidentiary privileges which function by the exclusion of evidence</u> [], operate as limitations upon liability.") (citations omitted) (emphasis in original).

Accordingly, California's litigation privilege can potentially bar Amaretto's pendent state law claims.

### 2. The Litigation Privilege Is Not A Bar to Amaretto's Pendent State Law Claims, Because, as Pleaded, Those Claims Arise Out of Unprotected Activity

Amaretto's tortious interference and unfair business practices claims stem primarily from (1) the DMCA Takedown Notifications sent by Ozimals to Linden and (2) statements and publications by Ozimals to the public about Amaretto's alleged infringement. California's litigation privilege protects communications (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action. See <u>Silberg v. Anderson</u>, 50 Cal. 3d 205, 219 (1990). The privilege has been

7

construed broadly to protect "any publication [that] has a reasonable relation to the action and is permitted by law . . . ." Albertson v. Raboff, 46 Cal. 2d 375, 380-81 (1956).

Taking the facts in the light most favorable to Amaretto, Ozimals's Takedown Notification and other publications (other than the cease-and-desist letter sent to Amaretto) fall outside the scope of the litigation privilege. With respect to the Takedown Notifications, they are not communications made in a judicial or quasi-judicial proceeding. Indeed, the DMCA procedure is designed to avoid court involvement. See Lenz, 2010 WL 702466 at *10. The other statements made by Ozimals that form the basis of Amaretto's claims are, as pleaded, not privileged because they were not intended to achieve the objects of the litigation and some might even have occurred before litigation commenced. See Silberg, 50 Cal. 3d at 219. Specifically, Amaretto alleged that Ozimals made statements about Amaretto's alleged infringement to people unconnected to any ongoing litigation and not for the purpose of advancing any object of litigation. "[A]t or about the time Defendants sent their cease-and-desist letter to Amaretto, Defendants were also sending correspondence to other members of the Second Life community making similarly false claims that Defendants had certain copyrights and that Amaretto was infringing them with its Horse Product Line." FAC (dkt. 68) ¶ 25. Rothman v. Jackson, 49 Cal. App. 4th 1134, 1141 (1996) ("Statements to nonparticipants in the action are generally not privileged under Section 47(b).").[4] Thus, Amaretto has pleaded enough to sidestep the litigation privilege bar, at least for now. Ozimals may reassert this defense in a summary judgment motion depending on what discovery reveals on this issue.

### C. The Tortious Interference Claim Is Dismissed Without Prejudice Because it is Not Plausibly Pleaded

The allegations supporting Amaretto's tortious inference claim are not sufficient to state a claim.

---

[4] Ozimals argues that Abraham v. Lancaster Community Hosp., 217 Cal. App. 3d 796, 823-24 (1990) shows that the litigation privilege should apply here. Not so. The publications of the allegedly damaging statements made to third parties in Abraham were (1) "a report [in a newspaper] of the pleadings in [a] federal complaint" and (2) communication "of the allegations [in the complaint] within the" community. Id. at 823. Here, Amaretto alleges that Ozimals's statements to third parties were not mere restatements of the content of court pleadings. See FAC (dkt. 68) ¶ 25.

8

The elements of a tortious interference with prospective economic advantage claim are as follows:

> (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional [wrongful] acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1151 (2008) (quoting Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 950 (Cal. 2003)).

Amaretto's allegations in support of its intentional interference claim are as follows:

- [B]y broadcasting false claims of infringement and invoking the DMCA without justification, Defendants clearly intended to damage Amaretto's product sales during the crucial holiday season and, at the same time, to bolster the Defendants' sales of their own, supposedly "legitimate" products. Despite the injunctive relief Amaretto has received thus far, Defendants' conduct has already caused and will continue to cause irreparable harm to Amaretto's business and reputation . . . .

- Defendants knew of Plaintiff's business and economic relations with existing and potential purchaser [sic] of its Amaretto Horse Product Line and that Plaintiff's expectancy of additional sales to existing customers and new sales to new customers would be disrupted by Defendants' repeated knowing misrepresentations to members of Second Life that Plaintiff's products were infringing Defendants' supposed copyrights. By causing current and prospective customers to question the legitimacy of Plaintiff's products, Plaintiff is informed and believes that Defendants induced those existing and potential customers to purchase alternative products to Plaintiff's, thereby harming Plaintiff.

- Defendants . . . falsely disparaged the quality of Plaintiff's products and [that] was a substantial cause of prospective purchasers of those products instead choosing to purchase others.

FAC (dkt. 68) ¶¶ 14, 47, 48.

Amaretto's allegations are little more than a conclusory restatement of the elements of a tortious interference claim. The critical allegations as to the existence of an "economic relationship between the plaintiff and some third party," "actual disruption of the relationship," and resulting "economic harm" are simply that (1) "Plaintiff is informed and believes that Defendants induced those existing and potential customers to purchase alternative products to Plaintiff's, thereby harming Plaintiff"; and (2) "Defendants . . . falsely disparaged the quality of Plaintiff's products and [that] was a substantial cause of prospective

9

1 purchasers of those products instead choosing to purchase others." Id. ¶¶ 47-48. This is not
2 enough.

3 In Sybersound Records, the Ninth Circuit affirmed dismissal of a tortious interference
4 claim under similar circumstances. The plaintiff alleged that the defendants intended to and
5 did disrupt the plaintiff's business relationships with its customers "by engaging in the
6 wrongful acts of misrepresenting to the Customers that the Corporation Defendants are
7 paying all royalties required under their licensing contracts, and that [the plaintiff] does not
8 have valid licenses for its songs." 517 F.3d at 1151. The Ninth Circuit found insufficient the
9 "conclusory" allegations that the plaintiff "has been harmed because its ongoing business and
10 economic relationships with Customers have been disrupted.' [The plaintiff] does not allege,
11 for example, that it lost a contract nor that a negotiation with a Customer failed." Id.; see
12 also DocMagic, Inc. v. Ellie Mae, Inc., 745 F. Supp. 2d 1119, 1154 (N.D. Cal. 2010) ("[The
13 intentional interference with prospective economic advantage] cause of action must be
14 dismissed for failure to identify at least one specific, ongoing business relationship that was
15 disputed . . . ."); Silicon Knights, Inc. v. Crystal Dynamics, Inc., 983 F. Supp. 1303, 1312
16 (N.D. Cal. 1997). Amaretto's allegations in support of its tortious interference claim are of a
17 similarly conclusory nature. They do not allege any particular lost contracts or failed
18 negotiations or even a failure to meet reasonable sales projections that can be plausibly tied
19 to Ozimals's actions. See FAC (dkt. 68) ¶¶ 14, 47, 48.

20 In support of its argument that its allegations are sufficiently pleaded, Amaretto relies
21 principally on TYR Sport, Inc. v. Warnaco Swimwear, Inc., 679 F. Supp. 2d 1120, 1139-40
22 (C.D. Cal. 2009). That case concerned allegations by TYR Sport that Speedo was engaged in
23 a course of conduct designed to mislead consumers into believing that Speedo's swimwear
24 was superior to TYR's. In finding TYR's tortious interference allegations sufficient to state
25 a claim, the court noted that (1) the "Federal Rules do not require that [a] complaint allege
26 the specific third party or class of third parties with whom he claims to have had a valid
27 business expectancy"; and (2) it is sufficient to allege "that such an [economic] expectancy
28 existed and that [defendants] purposefully interfered with it." Id.; see also Sebastian Int'l v.

10

Russolillo, 128 F. Supp. 2d 630, 637 (C.D. Cal. 2001) (sufficient to allege "some customers" may stop purchasing plaintiff's hair products because they "lost their salon appeal" when made available in retail stores).

TYR Sport is not compelling authority for allowing Amaretto's tortious inference claim to proceed as pleaded. Although the level of pleading detail here is in some respects similar to that in TYR Sport, the Court does not find TYR Sport persuasive. It relied primarily on two cases – one from the Central District of California and the other from the Seventh Circuit – that were decided pre-Twombly/Iqbal. 679 F. Supp. 2d at 1139-40 (citing Sebastian Int'l, 128 F. Supp. 2d at 637; Cook v. Winfrey, 141 F.3d 322, 328 (7th Cir. 1998)). Further, it did not cite Sybersound Records, seemingly applicable Ninth Circuit authority.

Accordingly, Amaretto's tortious interference claim is dismissed in its entirety without prejudice.[5] To the extent Amaretto seeks to base the tortious interference claim on fraud, it must re-plead that fraud with particularity under Rule 9.[6]

### E. The Unfair Business Practices Claim is Viable

Amaretto's Unfair Business Practices Claim is plausibly pleaded. As such, Ozimals's Motion to Dismiss that claim is DENIED.

### F. The Copyright Misuse Claim Is Viable

Copyright misuse is ordinarily an affirmative defense to a claim for copyright infringement. Practice Mgmt. Info. Corp. v. Am. Med. Ass'n, 121 F.3d 516, 520 (9th Cir. 1997). The doctrine "forbids the use of the [copyright] to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which is contrary to public policy to

---

[5] Amaretto represented to the Court during oral argument on the motion to dismiss that it could amend to add additional facts.

[6] With respect to the tortious interference claim, Amaretto alleges, among other things, that Ozimals (1) made "knowing misrepresentations to members of Second Life that [Amaretto]'s products were infringing [Ozimals]'s supposed copyrights"; (2) "falsely disparaged the quality of [Amaretto]'s products . . . ."); and (3) "claim[ed] – in repeated representations to the Second Life community, excepting [Ozimals]'s DMCA notice – that all of [Amaretto]'s products infringe [Ozimals]'s alleged copyrights." FAC (dkt. 68) ¶ 47-48, 51. These allegations are "grounded in fraud." See Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009); Vess v. Ciba-Geigy Corp., 317 F.3d 1097, 1103-1104 (9th Cir. 2003). As such, that fraud must be pleaded with the requisite particularity.

11

1  grant." Altera Corp. v. Clear Logic, Inc., 424 F.3d 1079, 1090 (9th Cir. 2005) (quoting
2  Alcatel USA, Inc. v. DGI Techs, Inc., 166 F.3d 772, 792 (5th Cir. 1999)). If a court finds
3  that a copyright holder misused its copyright, it does not "invalidate the copyright, but
4  precludes its enforcement during the period of misuse." Practice Mgmt., 121 F.3d at 520 n.9.
5      Amaretto's FAC includes a claim for copyright misuse. FAC ¶¶ 55-60. There is no
6  consensus on whether copyright misuse can be brought as an independent claim (as opposed
7  to as an affirmative defense) and district courts come down on both sides of the issue.
8  Compare Apple Inc., v. PsyStar Corp., No. C 08-03251, 2009 WL 303046 (N.D. Cal. Feb. 6,
9  2009) (allowing misuse counterclaim); Elec. Data Sys. Corp. v. Computer Assoc. Int'l, Inc.,
10 802 F. Supp. 1463, 1465-66 (N.D. Tex. 1992) (denying defendant's motion to dismiss a
11 copyright misuse claim); Midwest Tape v. Recorded Books, No. 3:09 CV 2176, 2010 WL
12 1258101 at *1 (N.D. Ohio Mar. 26, 2010) (allowing an independent claim of copyright
13 misuse "because the Complaint seeks declaratory judgment"); Adobe Systems Incorp. v.
14 Norwood, No. C 10-03564, 2011 WL 845923 (N.D. Cal. Mar. 8, 2011); Adobe Systems
15 Incorp. v. Kornrumpf, No. C 10-02769, 2011 WL 181375 (N.D. Cal. Jan. 19, 2011) with
16 Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 269 F. Supp. 2d 1213, 1225-27 (C.D.
17 Cal. 2003); Ticketmaster v. RMG Tech., Inc., 536 F. Supp. 2d 1191, 1198-99 (C.D. Cal.
18 2008).
19     In this Court's view, an affirmative claim of copyright misuse is appropriate in this
20 case, and Ozimals's motion to dismiss that claim is DENIED.[7]
21 //
22 //
23 //
24 //
25 //

---

[7] Although an independent claim for copyright misuse is proper, Amaretto cannot recover damages. "Many district courts have held that copyright misuse does not support a claim for damages." Adobe Sys. Inc, 2011 WL 845923 at *4.

## IV. CONCLUSION

For the foregoing reasons, Ozimals's Motion to Dismiss (dkt. 72) is GRANTED in part and DENIED in part, as set forth above.

**IT IS SO ORDERED.**



Dated: April 22, 2011

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE