KENNETH E. KELLER (SBN 71450) kkeller@ksrh.com
ANNE E. KEARNS (SBN 183336) akearns@ksrh.com
GARTH A. ROSENGREN (SBN 215732) grosengren@ksrh.com
KELLER, SLOAN, ROMAN & HOLLAND LLP
555 Montgomery Street, 17th Floor
San Francisco, CA  94111
Telephone:     (415) 249-8330
Facsimile:      (415) 249-8333

STEVAN H. LIEBERMAN (*Pro Hac Vice*) stevan@aplegal.com
GREENBERG & LIEBERMAN, LLC
2141 Wisconsin Ave., NW Suite C2
Washington, DC  20007
Telephone:     (202) 625-7000
Facsimile:      (202) 625-7001

Attorneys for Plaintiff
AMARETTO RANCH BREEDABLES, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMARETTO RANCH BREEDABLES, LLC, a California Limited Liability Corporation<br><br>Plaintiff,<br><br>v.<br><br>OZIMALS, INC., an Alabama corporation; CANDACE SARGENT, an individual; CAMERON HOLT, an individual; CREATIVE ACORN STUDIOS, an Alabama entity,<br><br>Defendants.<br><br>────────────────────<br>AND RELATED COUNTER-CLAIM | CASE No.: CV 10-5696 CRB<br><br>**AMARETTO RANCH BREEDABLES, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION**<br><br>Date:   May 10, 2013<br>Time:  10:00 a.m.<br>Judge:  Hon. Charles R. Breyer<br>Courtroom:     6, 17th Floor<br>Complaint Filed:  December 15, 2010 |

# TABLE OF CONTENTS

**PAGE(S)**

I.    INTRODUCTION ............................................................................................ 1

II.   SUMMARY OF ARGUMENT ......................................................................... 3

III.  STATEMENT OF RELEVANT FACTS ......................................................... 4

    A.    Events Leading Up to the Lawsuit.......................................................... 4

          1.    Ozimals Sent a Cease & Desist Letter; Amaretto Responded ...................... 4

          2.    Ozimals Obtained a Copyright Registration for the Code under False Pretenses ......................... 6

          3.    Ozimals Served Two DMCA Notices; Amaretto Filed Suit and Obtained a TRO and Preliminary Injunction ......................... 7

    B.    Defendants' Defamatory Statements ....................................................... 8

          1.    The Article ............................................................................ 8

          2.    The Article Linked to an Online Chat and Cease & Desist Letter.................. 9

IV.  THE DEFAMATORY STATEMENTS ARE ACTIONABLE ......................... 10

    A.    The Standard for Defamation Claims ................................................... 10

    B.    Under the Totality of the Circumstances, Defendants' Statements Are Actionable ............................................... 12

          1.    The One-Sided, Factually Incomplete Statements Were Not Made in a Heated Debate ......................... 12

          2.    The Specific Statements Are Provably False................................. 14

    C.    Amaretto's Damages Are Presumed...................................................... 18

    D.    The Litigation Privilege Does Not Apply .............................................. 18

V.   THE TRADE LIBEL CLAIM SURVIVES.................................................... 20

VI.  AMARETTO'S INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE CLAIM SURVIVES ......................... 21

VII.  THE 17200 UNFAIR COMPETION CLAIM SURVIVES ............................. 22

VIII.  CONCLUSION............................................................................................. 25

i

# TABLE OF AUTHORITIES

## Cases

*Allard v. Church of Scientology of California*,
  58 Cal. App. 3d 439 (1976) ..................................................................... 18

*Art of Living Found v. Does 1-10*,
  2011 WL 2441898 (N.D. Cal. 2011) ..................................... 11, 13, 18, 20

*Baker v. Los Angeles Herald Exam'r*,
  42 Cal. 3d 254 (1986) ........................................................................... 13

*Bed, Bath & Beyond v. La Jolla Village Square Venture Parnters*,
  52 Cal. App. 4th 867 (1997) ................................................................. 21

*Cel-Tech Comm'n, Inc. v. Los Angeles Cellular Telephone Co.*,
  20 Cal. 4th 163 (1999) ..................................................................... 22, 23

*Copp v. Paxton*,
  45 Cal. App. 4th 829 (1996) ................................................................. 19

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
  11 Cal. 4th 376 (1995) ......................................................................... 21

*Expedited, Inc. v. Werner Enterprises, Inc.*,
  479 F.3d 1099 (9th Cir. 2007) ............................................................... 22

*Express, LLC v. Fetish Group, Inc.*,
  464 F.Supp.2d 965 (C.D. Cal. 2006) ..................................................... 24

*Financial Corp. of America v. Wilburn*,
  189 Cal. App. 3d 764 (1987) ................................................................. 19

*Franklin v. Dynamic Details, Inc.*,
  116 Cal. App. 4th 375 (2004) ......................................................... 17, 18

*Gruen v. Edfund*,
  2009 WL 2136785 (N.D. Cal. 2009) ..................................................... 24

*Hawran v. Hixon*,
  209 Cal. App. 4th 256 (2012) ........................................................ passim

*In re Tobacco II Cases*,
  46 Cal. 4th 298 (2009) ................................................................ 4, 22, 24

*KC Multimedia, Inc. v. Bank of America Tech. & Operations, Inc.*,
  171 Cal. App. 4th 939 (2009) ......................................................... 22, 23

*Korea Supply co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ...................................................................... 4, 21

*MacLeod v. Tribune Pub. Co.*,
  52 Cal. 2d 536 (1959) ........................................................................... 11

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990) ................................................................................. 4, 14

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
  319 F.Supp.2d 1059 (C.D.Cal.2003) ..................................................... 24

*Nicosia v. DeRooy*,
  72 F. Supp. 2d 1093 (N.D. Cal. 1999) ................................................. 13

*PMC, Inc. v. Saban Entertainment, Inc.*

ii

45 Cal. App. 4th 579 (1996) ............................................................................ 21

*Polygram Records, Inc. v. Superior Court*,
170 Cal. App. 3d 543 (1985) ....................................................................... 4, 20

*Rothman v. Jackson*,
49 Cal. App. 4th 1134 (1996) .......................................................................... 19

*Ruiz v. Harbor View Community, Ass'n*,
134 Cal. App. 4th 1456 (2005) .................................................................. 11, 14

*Silberg v. Anderson*,
50 Cal. 3d 205 (1990) ...................................................................................... 19

*Susan A. v. County of Sonoma*,
2 Cal. App. 4th 88 (1992) ................................................................................ 19

*Sybersound Records, Inc. v. UAV Corp.*,
517 F.3d 1137 (9th Cir. 2008) ..................................................................... 4, 15

*Underwager v. Channel 9 Australia*,
69 F.3d 361 (9th Cir. 1995) .................................................................. 3, 11, 12

**Statutes**

17 U.S.C. § 101 ...................................................................................... 4, 6, 15

17 U.S.C. § 102 ......................................................................................... 4, 15

17 U.S.C. § 408(a) ...................................................................................... 4, 6

Cal. Bus. & Prof. Code § 17200 ................................................................. 4, 22

Cal. Bus. & Prof. Code § 17203 ...................................................................... 22

Cal. Civ. Code § 45 ............................................................................ 3, 10, 18

Cal. Civ. Code § 45(a) ..................................................................................... 18

Cal. Civ. Code § 47(b) ..................................................................................... 19

Cal. Civ. Code § 48(4)(a) ................................................................................. 18

Cal. Civ. Code § 48(4)(b) ................................................................................. 18

Fed. Code Civ. P. 56 ....................................................................................... 22

**Other Authorities**

CACI 1704 ...................................................................................................... 18

U.S. Copyright Office Circular FL-108, Copyright Registration of Games .................................... 16

**Treatises**

2 Patry on Copyright § 5:127 ........................................................................... 15

**Regulations**

37 C.F.R. § 37 .................................................................................................. 6

iii

# I.      INTRODUCTION

On December 16, 2010, after this lawsuit had been filed, Defendants[1] posted a defamatory article on the Ozimals' website declaring that Plaintiff, Amaretto Ranch Breedables LLC ("Amaretto"), had stolen Ozimals' game concept, cloned its work, and infringed upon its copyright in its virtual bunnies (the "Article").  Defendants went on to state that Amaretto had made "unlawful decisions," engaged in "unfair competition," and made Second Life an "unsafe environment."  None of those statements were true.

The Article also linked to an online chat between individual Defendant, Candace Sargent ("Sargent"), and an Amaretto "dev team member" in which Sargent tells the team member that Amaretto's horse product had copied the "core concept" of the Ozimals' bunny.  The Article also linked to a cease and desist letter that Ozimals' attorney had previously sent to Amaretto, thereby republishing that letter outside of any litigation context and destroying any privilege that might have existed with respect to the original publication.  In that cease and desist letter, Defendants falsely stated that Amaretto had infringed upon its copyright, misrepresented the nature and extent of that copyright, and threatened to enforce its rights unless the parties reached an agreement.

Contrary to Defendants' argument now, the statements in the Article and the linked documents -- now published to the world -- are defamatory, constitute trade libel, and are actionable. They are not statements of opinion.  They are not rhetoric or hyperbole.  The Article's tone is serious and threatening, akin to a press release.  It did not invite "heated debate," nor did any debate ensue. The "facts" they recite are incomplete.  The Article fails in any respect to provide a link to Amaretto's response to the cease and desist letter, to Amaretto's complaint, or to any aspect of Amaretto's position.   The context in which the statements were made certainly lead the reader to believe only one thing -- Defendant's version of the facts -- namely that Amaretto is a copyright thief, one who has not developed its own "game" and must be stopped –  with an intent to bolster that position as "endorsed" by the law and their attorney.

---

[1] The Defendants are Ozimals, Inc. ("Ozimals"), Candace Sargent, Cameron Holt, and Creative Acorn Studios (collectively, the "Defendants").

1

And Defendants knew (or should have known) those statements were disparaging, false, and incomplete when they made them.  Defendants knew, for example, that Ozimals was not the owner of any copyright in the virtual bunnies.  When Ozimals applied to the United States Copyright Office in November 2010 for a copyright only in the software code for the bunnies, it represented that there were three authors of the original work (none of whom were works for hire).  That was false.  Ozimals also represented that all three had transferred their rights in the copyright to Ozimals by "written agreement."   That too was false.  And Defendants knew it.  In reality, Edward Distelhurst, the true author of the software, never assigned his rights to Ozimals, but rather retained all rights pursuant his independent contractor agreement with Defendants.  This was in direct contrast to another independent contractor agreement that Ozimals had entered into with another programmer -- prior to posting the Article.  In that agreement, the programmer was a work for hire, and thus, retained no intellectual property rights.   Sargent has conceded those facts in her deposition, but never mentioned them in the Article.

As a result, Ozimals was a mere non-exclusive licensee, as this Court previously confirmed in its order granting summary judgment against Ozimals on its copyright claim. (ECF 146).  A non-exclusive licensee is not and cannot be an "owner" of a copyright, has no right to obtain a copyright registration, and has no right to enforce a copyright.  Yet, Defendants falsely published to the world otherwise.

Second, Amaretto did not copy the software code for the virtual bunnies, and for Defendants to infer that it was copied is simply reckless.  At the time of posting the Article, Defendants had no basis to tell the world that Amaretto had copied the bunny code.  Ozimals had never seen Amaretto's code, and Amaretto never had had access to Ozimals' code.   At the beginning of this litigation, the Court ordered the parties to exchange their code and for each side to have an expert compare the codes.  Both experts confirmed that the Amaretto code had not been virtually copied from Ozimals' code, confirming the falsity of the Defendants' statements.  (ECF 70).

Third, none of the traits or elements that Ozimals claimed to have copyrighted are in fact copyrightable. They are functions, concepts, ideas and processes incapable of copyright protection under the U.S. Copyright Act.  Amaretto explained all of this to Defendants in its response to the

2

cease and desist letter prior to Defendants' posting of the Article.  Defendants ignored this and failed to disclose Amaretto's position in the Article – which might have allowed the public to make their own informed opinion.

Incredibly, Defendants now flaunt the fact that this Court has never ruled on the validity of its copyright – somehow implying that it is up for debate, and thus, not actionable.  But, the Court did not need to rule on validity when it ruled that Ozimals was a non-exclusive licensee (and thus, not an owner) of the copyright.  Regardless, Amaretto will prove that the elements are not copyrightable at trial.

The libelous statements also form the backbone of Amaretto's § 17200 unfair competition and intentional interference with prospective business advantage claims.  Amaretto lost sales because of this tortious conduct.

Defendants have presented no evidence why they should prevail on summary judgment.  Their entire mantra is that they were simply applying the facts to the law.  Once again, that is not a true statement, but rather self-serving revisionist history trying to avoid liability for their defamatory statements.  As set forth below, the facts are false, incomplete, and/or the assessment erroneous.  The statements are actionable, and summary judgment must be denied.

## II.    SUMMARY OF ARGUMENT

Defendants' motion for summary judgment, or in the alternative, summary adjudication must be denied for several reasons.  The Article and linked documents are defamatory per se, not privileged, and actionable.  *Hawran v. Hixon*, 209 Cal. App. 4th 256, 277 (2012), Cal. Civ. Code § 45.  Defendants published to the world that Ozimals owned a copyright in the bunnies and the game concept, and that Amaretto infringed upon it.   In the broad and specific context in which the statements are made, the reader is not lead to believe they are the author's mere opinion, or an invitation for a heated debated, but rather are assertions of fact, and that all facts have been disclosed.  *Underwager v. Channel 9 Australia,* 69 F.3d 361, 366 (9th Cir. 1995);  *Hawran v. Hixon*, 209 Cal. App. 4th at 289.

The "facts" however, are incomplete and provably false, and Defendants' assessment was

3

_____
AMARETTO'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
CASE NO.: CV 10-5696 CRB

erroneous.  *Hawran v. Hixon*, 209 Cal. App. 4th at 289; *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 18-19 (1990).  Ozimals was never an owner of the copyright in the bunnies (if any).  It was and always has been a mere non-exclusive licensee.  *Sybersound Records, Inc. v. UAV Corp*., 517 F.3d 1137, 1146 (9th Cir. 2008)) (ECF 146).   It had no right to apply for a copyright and no right to attempt to enforce it.  17 U.S.C. § 101; 17 U.S.C. § 408(a).  Defendants knew all of this, yet touted it otherwise to the world.  Moreover, the elements that Ozimals claims to be copyrightable, are not copyrightable.  They are functions, processes, ideas and concepts, many of which were already in public domain.  17 U.S.C. § 102.  Amaretto pointed all of this out to Defendants, but Defendants ignored it, choosing instead to post an article without reference to Amaretto's position.  This issue is for the jury to decide.

Just as the statements are defamatory they also constitute trade libel.  *Polygram Records, Inc. v. Superior Court*, 170 Cal. App. 3d 543, 548 (1985).  The statements disparage Amaretto, claiming it to be a copyright thief that did not develop its own product.  As a result, Amaretto lost sales.

The false statements, which caused damage to Amaretto, constitute the wrongful conduct in support of Amaretto's intentional interference with prospective advantage and 17200 unfair competition claims.  *Korea Supply co. v. Lockheed Martin Corp*., 29 Cal. 4th 1134, 1153 (2003); Cal. Bus. &  Prof. Code § 17200; *In re Tobacco II Cases*, 46 Cal. 4th 298, 311 (2009).

### III.    STATEMENT OF RELEVANT FACTS

**A.    Events Leading Up to the Lawsuit**

**1.    Ozimals Sent a Cease & Desist Letter; Amaretto Responded**

On November 2, 2010, prior to Ozimals applying for a copyright registration, Ozimals, through counsel, sent a cease and desist letter to Amaretto (the "Cease & Desist Letter").  (**Exhibit A,** Kearns Decl., ¶ 2).  In the Cease & Desist Letter, Ozimals asserted that Amaretto's virtual horses infringed upon Ozimals' "intellectual property rights," namely an alleged copyright in its breedable virtual bunnies in violation of the United States Copyright Act.  At this point, however, Ozimals had not even applied for a copyright registration with the United States Copyright Office.

Specifically, Ozimals claimed that Amaretto had "virtually cloned all aspects of the Ozimals Works, with the only material difference being that its animal is cloaked as a horse," and that Amaretto is "not engaged in fair competition." (*Id.*).   Ozimals' counsel identified specific examples of the supposed infringement, such as identical genetic traits (eye color); identical settings (roaming range); and identical expression of functionality (capacity to breed at age 7).  (*Id.*).

Ozimals' counsel further asserted that given Ozimals' "substantial investment" in its "intellectual property" it was left with no choice "but to protect its intellectual property rights against Amaretto's infringement."  (*Id.*).  Counsel went on to state that Amaretto has disregarded the financial and social interests of the user community by "putting an infringing product on the marketplace," and that  Ozimals could have, if it wanted, filed a take-down notice with Linden Labs, without advance warning, which would have resulted in the takedown of Amaretto's horses."  (*Id.*). Ozimals' counsel then threatened that if the parties failed to reach an agreement, Ozimals was prepared to "enforce its intellectual property rights through all available means."  (*Id.*).

Importantly, as discussed below, nowhere in this letter does Ozimals' counsel reveal that the co-author (if not the *only* author) of the code, independent contractor Edward Distelhurst, never assigned his rights in the copyright (if any) to Ozimals, and that Ozimals was (and is) at most, a mere non-exclusive licensee with no standing to assert *any* copyrights against Amaretto.  Ozimals' counsel was aware of the Distelhurst situation and certainly knew of the problems with respect to Ozimals' "ownership" of the copyright.

On November 22, 2010, Amaretto's counsel responded to the Cease & Desist Letter ("Response to Cease & Desist Letter").  (**Exhibit B**, Kearns Decl., ¶ 3).  Amaretto's counsel pointed out all of the reasons why the elements that Ozimals claimed to be copyrighted are in fact, not copyrightable.[2]   For instance Amaretto's counsel noted that the supposed copyrighted "traits" are really functional elements and/or concepts; that the Ozimals' bunny was not the first breedable animal in Second Life, but that many of the supposed copyrighted elements are in the public domain;

---

[2] At that time, Amaretto did not know that Ozimals was not the "owner" of the alleged copyright.

and that there are only so many ways to express the functions given the parameters of Second Life, among other things.  (*See id.*).

## 2.    Ozimals Obtained a Copyright Registration for the Code under False Pretenses

Thereafter, on November 29, 2010, Ozimals applied for and obtained a United States Copyright Registration only for the software code in its virtual breedable bunnies as deposited with the United States Copyright Office (the "661 Copyright Registration").[3]  In the Copyright application, Ozimals falsely claimed that the three "co-authors" of the code, Candace Sargent, Cameron Holt, and Edward Distelhurst (none of whom, Ozimals represented, were a work for hire) transferred their rights and interests in the code to Ozimals, Inc. by "written agreement."[4]  (**Exhibit C**, Kearns Decl., ¶ 4).  That was false.

Edward Distelhurst never assigned his rights in the copyright to Ozimals, by written agreement or otherwise.  Ozimals therefore was nothing but a mere non-exclusive licensee.  As a non-exclusive licensee, Ozimals was not and is not the "owner" of the copyright in the code, and had no right to obtain a U.S. Copyright Registration.  *See* 17 U.S.C. § 101 ("'Copyright owner', with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right"); 17 U.S.C. § 408(a) (only the "owner" of the copyright or an exclusive licensee may obtain a registration); *see also* 37 C.F.R. § 37 (a copyright claimant is either the author of the work or a person or organization who has obtained *ownership* rights).

Defendants *knew* that Ozimals was not the owner of any copyright in the bunnies at the time Ozimals applied for a U.S. Copyright Registration.   In fact, Distelhurst had entered into a written Independent Operator Agreement with Sargent (d/b/a Ozimals) a year prior, on October 20, 2009.  Pursuant to that Agreement, it was agreed that Distelhurst would receive 20% of all net profits in exchange for writing script to "launch the Ozimals project."  (**Exhibit D**, Kearns Decl., ¶ 5).  He was not a work for hire; he never assigned his rights in and to the copyright (if any) to Ozimals.  Distelhurst therefore retained all intellectual property rights in the code, and Ozimals was a mere

---

[3] U.S. Copyright Registration Number TX 7-251-661.

[4] Amaretto does not concede that Candace Sargent and Cameron Holt are co-authors of the bunny code, but does not need to address that issue in this Opposition.

6

non-exclusive licensee (as confirmed by this Court in its Order granting Summary Judgment against Ozimals' copyright infringement claim) (*see* ECF 146, attached as **Exhibit E**, Kearns Decl., ¶ 6). Moreover, the agreement is in contrast to the other independent contract agreement that Ozimals had entered into in early November 2010, with another independent contractor, who *was* a work for hire.[5]  Sargent conceded all of this in her deposition.  (**Exhibit F**, Kearns Decl., ¶ 7; Sargent Depo., 7:14-16; 101:1-103:2; 103:19-104:13).

Defendants' representation to the U.S. Copyright Office that all three "co-authors" had transferred their rights to Ozimals by "written agreement" means that they knew that such a written transfer agreement was required for ownership and registration.  However, they knew that no such transfer from Distelhurst had ever been obtained, and their representation to the Copyright Office was knowingly false.

Therefore, Ozimals obtained the '661 Copyright under false pretenses since it was never an owner of the copyright.  Owing a piece of paper (e.g., the '661 Copyright Registration) does not transform Ozimals' status from a non-exclusive licensee into a copyright owner.

### 3. Ozimals Served Two DMCA Notices; Amaretto Filed Suit and Obtained a TRO and Preliminary Injunction

On December 1, 2010 (and again on December 20, 2010), Ozimals served a DMCA notice on Linden Labs -- again falsely claiming that it is the owner of the copyright in the bunnies and that Amaretto's horses infringed upon its copyright.  (**Exhibits G & H**, Kearns Decl., ¶ 8).  Amaretto responded on December 9, 2010, explaining why Ozimals could not have a copyright as claimed (referring back go the Response to Cease & Desist Letter).  (**Exhibit I**, Kearns Decl., ¶ 9).

On December 15, 2010, with the looming threat of Linden taking down Amaretto's horses, Amaretto filed this suit against Defendants claiming, among other things, that Ozimals did not own a copyright, had misused its copyright, and had interfered with Amaretto's prospective business

---

[5] Ozimals entered into an independent contractor agreement with software programmer dated November 12, 2010, for the creation of certain code.  The parties agreed that whatever the programmer created would be for the benefit of and belong to the company.  In other words, the programmer was a work for hire.  Sargent was aware of those differences between Distelhurst's and the other programmer's agreement.  (Exh. F, Sargent Depo. 101:13-25; 364:13-367:9 (and Exhibit 32 thereto) (filed under seal)).

advantage, among other things. (ECF 1-2).  Amaretto also sought and obtained a temporary

restraining order (and eventually a preliminary injunction) preventing Linden from taking down the

Amaretto horses and related products.  (ECF 29 & 49).   Amaretto thereafter amended the complaint

twice after a series of motions to dismiss, eventually adding claims of defamation and trade libel

based on the defamatory statements described below.  (ECF 68, 80, 92, 104).  The remaining claims

in the Second Amended Complaint are Unfair Competition under California Business and

Professions Codes Section 17200; Defamation; Trade Libel; and Tortious Interference with

Prospective Business Advantage (to the extent they are not based on Ozimals' DMCA Takedown

Notifications).[6]  (ECF 92, 104, 152).

**B.**   **Defendants' Defamatory Statements**

   **1.**      **The Article**

         A day after the Complaint was filed, on December 16, 2010, the "Ozimals team" published

an article on its website, written by Candace Sargent[7] (i.e., the "Article") (**Exhibit J**, Kearns Decl., ¶

10).  Contrary to Defendants' assertion, the Article "is not clearly and unambiguously a recitation of

the facts leading up to the initiation of this litigation…."  (Motion at 14:12-13).  Nor does it allow

"the readers to independently evaluate the information therein."  (*Id*. at 8:18).

         Rather, the Article "clearly and unambiguously" condemns Amaretto for infringing upon

Ozimals' supposed copyright in the bunnies (e.g., its *concept*), and for creating an "unsafe

environment" in Second Life – without ever identifying, much less explaining, Amaretto's position.

Specifically, Ozimals falsely asserted:

- That Amaretto's (earlier) horse product was a "near complete clone of the Ozimals *concept of a breedable*";
- The "Ozimals works are protected by copyright";
- That Amaretto's (earlier) horse product was "nearly identical to the Ozimals work and would be infringing on the copyrights that Ozimals held if amaretto released it";

---

[6] This Court has already ruled that the common law unfair competition claim and all tort claims based upon the DMCA are dismissed. (ECF 104). As acknowledged by Amaretto, Amaretto is not asserting those claims.  (ECF 152).  This Court need not rule on those issues twice.

[7] Candace Sargent's avatar name is Candy Cerveau.  (Exh. F., Sargent Depo., 7:14-19).

- That Amaretto released a product that was "even more similar than what had been presented";

- That Amaretto must develop their own "*concept* so that any problems could be avoided";

- That Amaretto released a product "that infringed on the intellectual property rights of Ozimals";

- That Ozimals contacted an intellectual property attorney to gather information on the "scope of the infringement";

- That Ozimals did not want Amaretto's "*unlawful decisions*" to "affect the breedable community in such a negative way";

- That Ozimals was the first to develop breedable animals on Second Life ("Since Ozimals began development, there have been many other breedable pets introduced");

- That "what Amaretto did is *not fair competition* and if Ozimals did not stand up for copyright protections, we would be doing a disservice not just to our company y but every company in Second Life that develops a unique concept and brings it into our virtual world; and

- That "[w]e are fortunate to be able to invest into protecting our intellectual property and part of what we hope to do with this action is to help establish a *safer environment* for great ideas to flourish in Second Life."

(*See id*.) (emphasis added).  The Article was signed by "Your Ozimals Team."  (*Id*.)

### 2.    The Article Linked to an Online Chat and Cease & Desist Letter

Defendants' unlawful conduct did not end with the Article.  The Article also linked to and commented upon two other documents – neither of which (again) set forth Amaretto's position.

The first is a June 9, 2010, online chat between Sargent (the co-owner of Ozimals), and an Amaretto "dev team member" (which is not actually correct) (the "Online Chat") (**Exhibit K**, Kearns Decl., ¶ 11).  In the Online Chat, the "dev team member" asked if Ozimals had a copyright, while expressing doubt that it could.  Sargent responded that Ozimals had a copyright in the bunnies, and specifically, "in the way our game is set up."  That is false.  At no time did Ozimals copyright the "way the game was set up."

Sargent went on to say that "copyright infringement happens when you take too many game concepts and use them for a new product."  (*Id*.).  That too is false.   The "dev team member" noted that Amaretto was trying to avoid any copyright infringement, and therefore eventually agreed to give Sargent a list of the horse's features.  After viewing the notecard with the features, Sargent responded that Amaretto's horses have the same copyrighted "*core concepts*" as Ozimals:

> Since you asked me about it, I'll be honest.  In my opinion, you've changed the animal type and some of the names, but that's almost all the **core concepts** of the Ozimals bunnies, down to things like (sic) the 'hay bale' (nest) and the pet food and the genetics and the hovertext stats being the same and being in the same order, pairing (bonding), these types of body features (ears)  Do you see where I am going?  As far as copyright is concerned name changing doesn't mean the concepts changed.

(*Id.*) (emphasis added).  Ozimals referred to this On-Line Chat in the Article, and stated that upon reviewing the notecard, it was:

> immediately obvious that the current state of the Amaretto horse products was a near complete clone of the Ozimals concept of a breedable.  Since the Ozimals works are protected by copyright, the Ozimals owner notified the Amaretto development team member that the product in its current state was nearly identical to the Ozimals work and would be infringing on the copyrights that Ozimals held if Amaretto released it.

(*See* Exh. J).

The second document that Ozimals linked to was the Cease & Desist Letter (names redacted), the contents of which are discussed above.  (**Exhibit L,** Kearns Decl., ¶ 12).  By directing the public to the Cease & Desist Letter, Ozimals was republishing that document to the world.  No longer was it a communication from Ozimals' attorney to Amaretto.  Now, Defendants were directing everyone in Second Life and elsewhere to their document, which mentioned a number of false, misleading, and defamatory statements.  In the Article, Ozimals stated that the Cease & Desist Letter outlined "the infringement and the rights that Ozimals has in an attempt to come up with a solution that ends the infringement with the least impact on the community possible."  (*Id.*).

As discussed below, the Article, the Online Chat, and the republication of the Cease & Desist Letter all constitute actionable defamation and trade libel, and form the underlying claims for unfair competition and intentional interference with prospective advantage.

## IV.   THE DEFAMATORY STATEMENTS ARE ACTIONABLE

### A.   The Standard for Defamation Claims

"Defamation requires a publication that is false, defamatory, unprivileged, and has a tendency to injure or cause special damage."  *Hawran v. Hixon*, 209 Cal. App. 4th at 277.  Specifically, libel is defined as a "false and unprivileged publication by writing…which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."  Cal. Civ. Code § 45.  "'Statements that

contain such a charge directly, and without the need for explanatory matter, are libelous per se.  A statement can also be libelous per se if it contains a charge *by implication* from the language employed by the speaker and a listener could understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter.'" *Art of Living Found v. Does 1-10*, 2011 WL 2441898, * 5 (N.D. Cal. 2011) (emphasis in original).

"A viable defamation claim requires the existence of a provable falsehood." *Hawran v. Hixon*, 209 Cal. App. 4th at 289.  Thus, defamatory statements must be reasonably "'interpreted as stating actual facts' about an individual."[8]  *Id.* at 289.  To determine whether the statement implies an assertion of fact, the Ninth Circuit examines the totality of circumstances using a three part test:

> First, we look at the statement in its broad context, which includes the general tenor of the entire work the subject of the statement, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of the figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation.  Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false.

*Underwager v. Channel 9 Australia,* 69 F.3d at 366.  In applying the test, "'a court is to place itself in the situation of the … reader, and determine the sense or meaning … according to its natural and popular construction'.  That is to say, the publication is to be meassured [sic], not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader.  A defendant is liable for what is insinuated, as well as for what is stated explicitly." *MacLeod v. Tribune Pub. Co.*, 52 Cal. 2d 536, 547 (1959).

As discussed below, Defendants' statements are not simply an application of fact to law amounting to non-actionable opinion.  Rather, Defendants have made charging statements in a one-sided article supported by incomplete and provably false facts.

---

[8] While "pure opinions" are not actionable, "a statement of opinion that implies a false assertion of fact is." *Hawran v. Hixon*, 209 Cal. App. 4th at 289 (citation omitted).  Thus, an opinion is actionable "'if it could reasonably be understood as declaring or implying actual facts capable of being proved true or false.'" *Hawran v. Hixon*, 209 Cal. App. 4th at 289 (citing to *Ruiz v. Harbor View Community, Ass'n*, 134 Cal. App. 4th 1456, 1471 (2005)).

---

**B.      Under the Totality of the Circumstances, Defendants' Statements Are Actionable**

      **1.      The One-Sided, Factually Incomplete Statements Were Not Made in a Heated Debate**

Here, the broad and specific context in which Defendants made the defamatory statements – the Article, the Online Chat, and the re-published Cease & Desist Letter – makes them actionable. The tenor throughout the Article and linked documents is to convey one simple message to the reader, over and over again:  Amaretto is a thief who stole Ozimals' copyrighted concept in their virtual bunny and created an "unsafe environment" for all of Second Life.  (*See* Exhs. J, K, L).

The format of the Article is directly akin to a press release.  It begins with "The Ozimals team would like to take a moment to address your questions and explain the reasons behind the steps we have taken."  (Exh. J).  It then goes on to enumerate specific, supposedly "unlawful" acts by Amaretto infringing upon Ozimals' claimed copyright, all to the detriment of the Second Life community.  *Id*.  There is nothing in the context of those statements that would lead a reader to believe they are intended as anything other than factual statements.

As they now try to avoid liability, Defendants claim that the statements at issue are part of a "heated debate," and thus not actionable as factual statements.  Defendants' position is wrong.  It is true that when evaluating the broad context in which statements are made, the courts have found that statements made during a heated debate -- with <u>both</u> <u>sides</u> <u>weighing</u> <u>in</u> <u>on</u> <u>the</u> <u>controversy</u> -- are not actionable.  That is because the audience expects both sides to exaggerate and use hyperbole to prove their point, and are less likely to view the statements as fact rather than opinion.  *See* e.g., *Underwager v. Channel 9 Australia,* 69 F.3d at 366-67 (statements made during workshop included speakers on both sides of heated debate).

Thus, the contents of a blog *may* qualify as a heated debate if it serves as a forum <u>for</u> <u>the</u> <u>exchange</u> <u>of</u> <u>opinions</u> <u>on</u> <u>both</u> <u>sides</u> <u>of</u> <u>an</u> <u>issue</u>.  For example, in *Art of Living Found v. Does 1-10, supra,* 2011 WL 2441898, the plaintiff was a worldwide international education and humanitarian organization (the Art of Living Foundation).  Defendants were students or teachers of plaintiff who had started a couple of blogs, the ostensible purpose of which was to provide a forum for former

12

_____
AMARETTO'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
CASE NO.: CV 10-5696 CRB

1    students or adherents of the Art of Living to comment upon the organization.  Plaintiff claimed that

2    the defendants instead used the blogs to defame plaintiff.

3        The court found that the statements were protected opinion in the broad and specific context

4    in which they were given – namely in a critical blog with a heated discussion and criticism of the

5    Foundation.  The court noted that the fact that the blog provided a link to the Art of Living Website

6    and other articles about Art of Living that were positive, was "evincing of a forum for debate and

7    discussion."  *Id.* at 7.  The court also found that the statements were not capable of being proven true

8    or false, but rather were "too loose and hyperbolic" (e.g., voicing an opinion about the foundation's

9    lack of financial transparency).  *Id.* at *8.  *See also Nicosia v. DeRooy*, 72 F. Supp. 2d 1093, 1101-02

10   (N.D. Cal. 1999) (finding that audience less likely to view statements as assertions of fact when

11   made on personal website as part of heated debate in which plaintiff was fully engaged).

12       But the Article at issue here was not part of a "heated debate" but rather a one-sided

13   presentation of Ozimals' slanted view of the "facts."[9]  Amaretto had no voice whatsoever in the

14   Article.   There is no mention of Amaretto's position – or that Amaretto even has one.  There are no

15   links to Amaretto's Complaint or Amaretto's Response to the Cease & Desist Letter.  Instead,

16   Ozimals provided a link to the Online Chat and its own Cease & Desist Letter written by their

17   attorney (i.e., the "weight of legal opinion").  Both documents emphasized, once again, that Ozimals

18   "owned" a copyright upon which Amaretto had infringed, and that Amaretto had caused havoc upon

19   Second Life.  Defendants intentionally lead the audience to believe there are no other facts.  Indeed,

20   the three comments under the Article prove the point: they are all favorable towards Ozimals and are

21   based only upon the information given in the Article.[10]  Nowhere is Amaretto's position articulated

22

23   [9] Defendants point the California Supreme Court's decision in *Baker v. Los Angeles Herald Exam'r*
     for an example of an article that was not actionable.  *Baker v. Los Angeles Herald Exam'r*, 42 Cal.

24   3d 254, 267 (1986) (finding column which criticized documentary to be non-actionable opinion due,
     in part, to its sarcastic tone and use of "flashy hyperbole").  But the Article is markedly distinct from

25   Baker's – for example, it is serious in tone and even mentions hiring an attorney to investigate the
     "scope of infringement."  There is little hyperbole or figurative speech, as Defendants concede.  *See*

26   Motion at 14:14.  There is no invitation for a "heated debate."

27   [10] For example, an avatar named Whispers commented:  "I totally agree with the other two. You
     couldn't have had the other two without all the hard work you guys put into it and I know first hand.

28   Any one that knows you, knows that you are good kind people. It is sad that that some people can't
     come up with their own creative ideas. It would have been better for the whole community." (Exh.

13

1   or even referenced.   There is no debate; rather the Article is a one-sided false attack on Amaretto.

2       **2.      The Specific Statements Are Provably False**

3       The crux of the defamatory statements is that (1) Ozimals owns the copyright in the bunnies,

4   (2) the traits and concepts of the bunnies and the Ozimals' "game" are copyrightable, and (3)

5   Amaretto's horse products infringe upon that copyright, which in turn has created an unsafe

6   environment in Second Life.  The underlying "facts" however, are provably false, and their

7   assessment is erroneous, which Defendants knew or should have known (indeed it has now been

8   conclusively established that Ozimals is <u>not</u> the owner of the Copyright).  In other words Defendants

9   either made deliberate false statements or knew or should have known of their falsity.

10      A statement, even if purportedly an "opinion," is actionable if based upon underlying facts

11  that are false.

12      [A]n opinion based on implied, undisclosed facts is actionable if the speaker has no
        factual basis for the opinion…. An opinion is not actionable if it discloses all of the
13      statements of fact on which the opinion is based and those statements are true…. An
        opinion is actionable if it discloses all the statements of fact on which the opinion is
14      based and those statements are false.

15      *Ruiz v. Harbor View Community Ass'n*, 134 Cal. App. 4th at 1471 (internal citations

16  omitted).  As noted by the United States Supreme Court, "[e]ven if the speaker states the facts upon

17  which he bases his opinion, *if those facts are either incorrect or incomplete*, or if *his assessment of*

18  *them is erroneous*, the statement may still imply a false assertion of fact."  *Milkovich v. Lorain*

19  *Journal Co.*, 497 U.S. at 18-19.  (emphasis added).  Ozimals' "representations" about its copyright

20  and Amaretto's supposed infringement thereof are based entirely on falsities, and are therefore

21  defamatory.

22      First, as discussed above, Ozimals is not, nor has it ever been, the "owner" of the copyright

23  in the bunnies (to the extent there is one) – and Defendants knew it before they posted the Article.

24  As Defendants knew, Sargent (d/b/a Ozimals) and Edward Distelhurst entered into an independent

25  contractor agreement a year before the Article was posted.  Defendants knew that Distelhurst was

26  not a work for hire (as admitted on the November 29, 2010, '661 Copyright application).

27  _____

28  J).

14

1   Defendants knew that Distelhurst retained all rights in and to the copyright (in contrast to the

2   November 12, 2010 independent operator agreement Ozimals entered into with another

3   programmer).  Defendants knew that Distelhurst was required to, but never assigned his rights to

4   Ozimals by "written agreement" (even though they falsely represented otherwise to the U.S.

5   Copyright Office).  Sargent conceded all of this in her deposition. (Exh. F).  Therefore, Ozimals is

6   and always has been a non-exclusive licensee of any copyright in the virtual bunnies as confirmed by

7   this Court.  (Exh. E, ECF 146, citing to *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th

8   Cir. 2008)).

9          As a matter of law, a non-exclusive licensee is not an owner of copyrights.  *See* 17 U.S.C. §

10   101; 2 Patry on Copyright § 5:127 (a "nonexclusive licensee is not a copyright owner) (**Exhibit M,**

11   Kearns Decl., ¶ 13).  Thus, Ozimals' repeated statement that it owned and/or was the owner of the

12   copyright in the bunnies and had the right to enforce its supposed copyright is provably false.  One

13   must assume further that Ozimals' attorney was aware of this law and that Ozimals could not be an

14   owner of the copyright.

15          Second, Ozimals' claim (or inference) that Amaretto copied the bunny code was reckless.

16   Defendants could never have known if the code was copied without seeing Amaretto's code first.

17   Defendants did know, however, that Amaretto never had access to the Ozimals' code in the bunnies.

18   It has been conclusively established in this case that Amaretto did not copy the bunny code.  At the

19   beginning of this case, the Court ordered the parties to exchange code and to have experts compare

20   them.   Both experts agreed that Amaretto did not copy Ozimals' code identified in the '661

21   Copyright.  (*See* ECF 70, the Parties' Joint CMC Statement which sets forth both parties' expert

22   opinion that the code was not copied, pages 10-15).

23          Third, the "traits" and other elements of the bunnies and the "game concept" outlined in the

24   Article, Cease & Desist Letter, and Chat Log are not capable of copyright protection because they

25   are functions, concepts, and processes, are not original, contain *scenes a faire*, and/or are barred by

26   the merger doctrine. *See* 17 U.S.C. § 102 (the Copyright Act does not apply to any "idea, procedure,

27   process, system, method of operation, concept, principle, or discovery regardless of the form in

28   which it is described, explained, illustrated, or embodied in such work."); *see also* TRO (ECF 29:

15

"This is because software copyright protection does not apply to functionality…Thus, even if Defendant was the first to come up with a virtual animal that requires 'food' to 'live,' any copyright it has does not prevent another company from marketing virtual animals with similar traits provided, essentially, that the company did not copy Defendant's programming."); *Tableau Software, Inc. v. Any Aspect KFT*, 2008 WL 4287557, * 1 (N.D. Cal. 2008).

Even the Copyright Office has published a Circular to emphasize that, other than the written element, the idea for a "game" or method for playing it is not copyrightable, and nothing prevents others from developing a "game based on similar principles":

> Copyright does not protect the idea for a game, its name or title, or the method or methods for playing it. Nor does copyright protect any idea, system, method, device, or trademark material involved in developing, merchandising, or playing a game. Once a game has been made public, nothing in the copyright law prevents others from developing another game based on similar principles. Copyright protects only the particular manner of an author's expression in literary, artistic, or musical form.

> Material prepared in connection with a game may be subject to copyright if it contains a sufficient amount of literary or pictorial expression. For example, the text matter describing the rules of the game or the pictorial matter appearing on the gameboard or container may be registrable.

> If your game includes any written element, such as instructions or directions, the Copyright Office recommends that you apply to register it as a literary work. Doing so will allow you to register all copyrightable parts of the game, including any pictorial elements. When the copyrightable elements of the game consist predominantly of pictorial matter, you should apply to register it as a work of the visual arts.

U.S. Copyright Office Circular FL-108, Copyright Registration of Games (**Exhibit N**, Kearns Decl., ¶ 14).

Amaretto pointed out to Defendants all of the reasons why the traits of the Ozimals' bunnies were not copyrightable in its Response to the Cease & Desist Letter – prior to Defendants posting the Article.  Defendants were thus well aware that such elements were and are not copyrightable, yet they posted the Article anyway.  Defendants never provided the public with Amaretto's response which would have allowed them to make their own informed decision.  Rather, Defendants recklessly provided an incomplete set of facts, which were and are provably false as Amaretto's

experts will establish at trial.[11]

Defendants rely upon the decision in *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 387 (2004) to argue that their statements about Amaretto are not actionable.  But in *Franklin*, the court found that a defendant's written statements that plaintiff had stolen copyrighted material and breached a non-disclosure agreement were not actionable because defendant had fully disclosed *all* of the facts that it based its opinion on, which facts were *provably true*.[12]  *Id.* at 387-388.  No such findings can be made in this case.  Ozimals made no effort to furnish its readers with sufficient facts to reach their own conclusions and, moreover, Ozimals' claim that its owns a copyright infringed by Amaretto is demonstrably false.[13]  Summary judgment must therefore be denied.

---

[11] The parties have just exchanged expert reports and Amaretto's experts are preparing the rebuttal reports.

[12] In *Franklin*, Plaintiff, a sales representative of electronic goods, sent an email to various persons in the industry, including defendant, advising that one of its clients had a new website.  Plaintiff identified an internet address in the email, which led the viewer back to plaintiff's website.  From there, the client's website could be accessed.  When Defendant visited the clients' website through the links provided, he noticed that part of the catalog on the client's website included information that had been copied from two other companies.  Defendant then sent emails to those other companies advising that plaintiff and the client had "stolen copyrighted material" from them, and that the site "constitutes a breach of the … nondisclosure agreement."  He included plaintiff's original email and told them to "follow the path."  *Id.* at 380.

The court found that the statement that plaintiff had "stolen copyrighted material," although defamatory per se, was not actionable because defendant had disclosed supporting facts, giving readers the ability to form their own opinion (e.g., plaintiff's original email, and the suggestion to "follow the path" of the websites).  *Id.* at 387-88.  The court also found that the facts upon which defendant's opinions were based were provably true because the "existence, content, and layout of the Web sites were not in dispute in any material way."  *Id.* at 388.  The court also found that the context in which the statements were made pointed towards opinion because defendant did not purport to be an attorney, and the reader would not assume the emails had the "weight of legal opinion."  *Id.* at 389.

[13] Defendants flaunt the fact that the Court never ruled on the validity of Ozimals' copyright.  But that is irrelevant (and a perfect example of copyright misuse).  The Court ruled that Ozimals is a non-exclusive licensee; it did not need to rule on validity.  As a non-exclusive licensee, Ozimals never owned a copyright, valid or otherwise (even if it fraudulently procured a copyright registration).  Ozimals can never assert it against anyone (and for that reason the Court dismissed Ozimals' declaratory relief and copyright misuse claims). (ECF 146).  Regardless, the lack of "validity" will be addressed at trial since Amaretto will need to prove the statements were provably false.

## C.      Amaretto's Damages Are Presumed

Defendants do not dispute that Amaretto has been damaged as a result of the defamatory statements.  Nor could they.  The statements at issue are defamatory per se. [14]  They charge Amaretto with being a thief, for copyright infringement, for unlawful conduct, for making Second Life an unsafe environment, and for engaging in unfair competition.  *See* Cal. Civ. Code § 45; *Art of Living Found v. Does 1-10*, *supra,* 2011 WL 2441898, * 5; *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th at 387 (statements that plaintiff had "stolen copyrighted material" and had breached the non-disclosure agreement was defamatory per se, although not actionable).  General damages are thus presumed.  *See Allard v. Church of Scientology of California*, 58 Cal. App. 3d 439, 450 (1976) ("In matters of slander that are libelous per se, for example the charging of a crime, general damages have been presumed as a matter of law." ); Cal. Civ. Code § 48(4)(a) (defining "General Damages").  In addition, Amaretto is not required to prove special damages.  Cal. Civ. Code § 45(a); Cal. Civ. Code § 48(4)(b) (defining "Special Damages").  Accordingly, even if Amaretto does not prove actual damages, the jury may still award it compensation for assumed harm.  CACI 1704.

## D.      The Litigation Privilege Does Not Apply

This Court has already ruled that the defamatory statements alleged in the complaint, excluding the *initial publication* of the Cease & Desist Letter, are not covered by the litigation privilege.  (ECF 80, pp. 7-8). [15]  The Court noted, however, that Ozimals may "reassert this defense in a summary judgment motion depending on what discovery reveals on this issue."  (*Id*. at 8:20-21).  Nothing in discovery should change the Court's ruling, but rather affirms it.

"California's litigation privilege protects communications (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the

---

[14] Defendants do not contest that the statements are defamatory per se. They cite to the jury instruction CACI 1704, "Defamation per se – Essential Factual Elements (Private Figure – Matter of Private Concern")" in support of their Motion.  *See* Motion at 14:25-15:10.

[15] The Court initially ruled that the DMCA Take-Down Notices were not covered by the litigation privilege.  (ECF 80).  However, the Court later ruled that all tort claims based upon the DMCA Take-Down notice were preempted by federal law. (ECF 104).   Accordingly, no claims based on the DMCA notice have survived, as acknowledged by Amaretto in its notice to the Court of Remaining Claims (ECF 152).

---

objects of the litigation; and (4) that have some connection or logical relations to the action." *See*

*id*., citing to *Silberg v. Anderson*, 50 Cal. 3d 205, 219 (1990)); *see also* Cal. Civ. Code § 47(b)...

Court have ruled that "[s]tatements to nonparticipants in the action are generally not privileged under

Section 47(b)." *Rothman v. Jackson*, 49 Cal. App. 4th 1134, 1141 (1996); *Financial Corp. of*

*America v. Wilburn*, 189 Cal. App. 3d 764 (1987) (communications to "persons throughout Northern

California" not privileged; no privilege "as to actionable words spoken before persons in no way

connected with the proceeding") (citation omitted); *Susan A. v. County of Sonoma*, 2 Cal. App. 4th

88, 93-94 (1992) ("the privilege does not apply where publication is to persons in no way connected

with the proceeding.").  Moreover, the litigation privilege does not cover republication of an

otherwise privileged document.  *See* e.g., *Copp v. Paxton*, 45 Cal. App. 4th 829, 844 (1996).

Defendants bear the burden of proving the privilege's applicability.  *Hawran v. Hixon*, 209 Cal. App.

4th at 278.

   As this Court has previously acknowledged, the litigation privilege does not apply here, and

nothing has changed.  Ozimals' statements were made to persons not connected in any way to the

litigation at hand, and were not intended to achieve the objects of litigation.  Defendants posted the

Article on Ozimals' website alleging that Plaintiff's horses are a "clone" of Defendant's product, and

that the alleged infringement was "immediately obvious."  (*See* Exh. J).  The Article posted a link to

the Online Chat (Exh. K), and republished a copy of Defendants' Cease & Desist Letter (via link) –

thereby removing any litigation privilege that might have applied.  (Exh. L).  By posting the Article

and linking two other documents to Ozimals' website, Defendants effectively disseminated this

information to the entire world (which we know at least three people read), with no legitimate

litigation purpose other than to defame Amaretto.  Nothing in discovery changes those facts, and

Defendants have presented none.[16]

---

[16] Defendants' argue that the statements (e.g., Article and linked documents) are not
"correspondence" for purposes of the litigation privilege.  But Defendants read the Court's Order too
literally. They are defamatory publications, and as discussed, are not covered by the litigation
privilege.

## V.   THE TRADE LIBEL CLAIM SURVIVES

The law defines "trade libel" as "'an intentional disparagement of the quality of property, which results in pecuniary damage to plaintiff.'"  *Polygram Records, Inc. v. Superior Court*, 170 Cal. App. 3d at 548 (citation omitted).   The elements for a claim 'requires: (1) a publication, (2) which induces others not to deal with plaintiff, and (3) special damages."  *Art of Living Foundation v. Does 1-10*, 2011 WL 2441898, at *9.  All elements are met here, and summary adjudication of this claim should be denied.

First, when Defendants published the Article with links to the Online Chat and Cease & Desist Letter, they intentionally disparaged Amaretto and its products.  They claimed and/or inferred that Amaretto's virtual horse product was a "near complete clone" of Ozimals' virtual bunny, and that Amaretto had not done the work to develop their own product for themselves; that Amaretto infringed upon Ozimals' (non-existent) copyright; that Amaretto was engaging in "unlawful" conduct and "unfair competition"; and that Amaretto had created an "unsafe environment" by copying Ozimals' work – all of which had to be stopped.[17]  (Exhs. J, K, L).  As explained in detail above, those statements were not mere opinions, but were defamatory and meant to harm Amaretto. As stated, Defendants knew they were false (or should have known) when they were made. Moreover, Defendants intentionally published the statements during the important holiday season for the purpose of inducing customers to not deal with Amaretto, a question the jury must decide.

Second, the evidence shows that Amaretto suffered pecuniary loss due to Defendants' publication of the Article – a point Defendants do not dispute in their Motion.  Amaretto's sales dipped on December 17**,** 2010, one day following the Article.  In addition, as a result of the Article, Amaretto, Amaretto's sales dipped, and it was forced to give away free food during the period of January 10, 2011 through January 17, 2011, in order to alleviate customer concerns about, among other things, the horses' viability given Ozimals' public allegations.  (*See* Amaretto's Expert Report at ¶¶ 18-22; **Exhibit O,** Kearns Decl., ¶ 15, filed under seal).

---

[17] Ozimals states that statements that are not "of and concerning" plaintiff are not actionable. Motion at 10:4-5.  But that is not the case here.  Ozimals made it clear over and over again that they were talking about Amaretto. (*See* Exhs. J, K L).

Accordingly, the trade libel claim survives summary judgment/adjudication.

## VI.    AMARETTO'S INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE CLAIM SURVIVES

To state a claim for intentional interference with prospective economic advantage, a plaintiff must prove the following:

> (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

*Korea Supply co. v. Lockheed Martin Corp*., 29 Cal. 4th at 1153.

In addition to proving these five elements of the cause of action, a plaintiff must prove that the defendant's conduct was "wrongful apart from the interference itself." *Id.* at 1154 (citing to *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995)).  An act is independently wrongful if it is independently tortious or a restraint of trade; is conduct that violates a statute, or other regulation, or a recognized rule of common law, or an established standard of a trade or profession; or is conduct that is illegal or unfair or immoral according to the common understanding of society.  *Bed, Bath & Beyond v. La Jolla Village Square Venture Parnters*, 52 Cal. App. 4th 867, 883 fn.10 (1997); *see also PMC, Inc. v. Saban Entertainment, Inc.* 45 Cal. App. 4th 579, 603 (1996) (*overturned on other grounds* in *Korea Supply Co., supra*, 29 Cal. 4th at 1159, fn 11); ("Commonly included among improper means are actions which are independently actionable, violations of federal or state law or unethical business practices, e.g., violence, misrepresentation, unfounded litigation, defamation, trade libel or trade mark infringement").

Defendants claim that Amaretto has not met the second or third element or the underlying wrongful conduct.  They are wrong.  First, Defendants were well aware that Amaretto had economic relationships with Second Life customers.  Sargent admitted in deposition that Ozimals' revenues decreased significantly when Amaretto, a competitor, entered the marketplace and introduced its virtual horses to the Second Life.  (Exh. F, Sargent Depo. 56:10-23).  The clear implication is that Ozimals' lost sales went to Amaretto.  Defendants knew or should have known that Amaretto had customers on Second Life (supposedly Ozimals' customers).

21

Second, Amaretto has established the underlying intentional wrongful conduct that was designed to disrupt the relationship.  As set forth in detail above, Amaretto has established that Defendants published defamatory statements and committed trade libel, knowing such statements were false (or should have known).   A jury could find that such statements, made during the holiday season, were intentionally design to disrupt Amaretto's business, which they in fact did.  (Exh. O).

Amaretto has also established that Defendants' wrongful conduct amounts to unfair competition under section 17200, discussed below.  *Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1108-1111 (9th Cir. 2007) (finding that a properly pled claim for unfair competition serves as basis for independent wrong).

## VII.    THE 17200 UNFAIR COMPETION CLAIM SURVIVES

As an initial matter, this Court has already ruled that Amaretto's common law unfair competition claim is dismissed. (ECF 104).  It need not do so again.

Defendants argue that Amaretto's *entire* unfair competition claim must be dismissed because Amaretto seeks remedies in paragraph 62 of its second amended complaint that are not permissible under section 17200 of the Business & Professions Code ("UCL") (e.g., punitive damages, attorney's fees).  Defendants are not entitled, however, to a dismissal of the *entire* claim based solely upon the remedy sought.  Rather, they may seek summary adjudication as to the prayer for relief. *See e.g.*, Fed. Code Civ. P. 56.  Defendants provide no contrary authority.  In short, Amaretto is entitled to seek injunctive relief and restitution, which it has claimed (ECF, ¶¶ 61, 62).   Cal. Bus. & Prof. Code § 17203;  *Cel-Tech Comm'n, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 179 (1999).  Those remedies must stand.

Defendants also argue that Amaretto cannot establish the three prongs of unfair competition under the UCL, namely that Defendants conduct was an "unlawful, unfair or fraudulent business act or practice…"  UCL § 17200; *In re Tobacco II Cases*, 46 Cal. 4th at 311.  Defendants' argument fails.

First, under the "unlawful" practices prong, a business practice is "unlawful" if it is "forbidden by any law." *KC Multimedia, Inc. v. Bank of America Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 961 (2009) (citation omitted).  Amaretto's "unlawful" unfair competition claim is

22

1  derived from its defamation and trade libel claims.  Since those claims survive, so must the unfair

2  competition claim.  *Hawran v. Hixon*, 209 Cal. App. 4th at 277.

3       Second, a business practice may be "unfair" (or fraudulent) in violation of the UCL even if

4  the practice does not violate any law.  *KC Multimedia, Inc. v. Bank of America Tech. & Operations,*

5  *Inc.*, 171 Cal. App. 4th at 961 (citation omitted); *Cel-Tech Communications, Inc. v. Los Angeles*

6  *Cellular Telephone Co.,* 20 Cal. 4th at180 (citation omitted).  When a plaintiff who claims to have

7  suffered injury from a direct competitor's "unfair" act, the word "unfair" means "conduct that

8  threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws

9  because it effects are comparable to or the same as a violation of the law, or otherwise significantly

10  threatens or harms competition."  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone*

11  *Co.,* 20 Cal. 4th at 187.

12       Here, Defendants falsely published to third parties (via its Article) that Ozimals owned a

13  copyright in its products and game concept and that Amaretto had infringed upon that alleged

14  copyright – none of which is true.   By broadcasting to the world that Ozimals owned a copyright

15  when it in fact did not, and by advertising their Cease & Desist Letter, Defendants are intending to

16  put a restraint on trade and destroy competition.  Such practice is inherently unfair.

17       In support of its motion, Defendants focus on Amaretto's allegation that it was prevented

18  from competing during the holiday season, and was forced to give away free food to its customers.

19  Defendants claim that allegation is false, and that Amaretto gave food away to deal with server

20  issues.  (Motion at 17:11-23).   But that is not true as noted on the face of the notecard itself.

21       Amaretto did give away a "healing pack" on January 9, 2011 due to "sick" horses.  However,

22  as noted on the notecard, Amaretto also gave away food beginning on January 10, 2013 because of

23  "certain issues".  (Exh. H to Ozimals' Appx).  Specifically:

24      2. As you all know by now we have had out hand tied up with certain issues outside our
    control that has caused our attention to remain focused on keeping the horses on the grid.

25      Now that much of that is out of the way, we want to do something we had planned to do
    over Christmas but didn't and we apologize….

26      Thank you again for your loyalty, honesty and most of all thank you for the support you
    have shown in our difficult times and thank you for sharing in our joyous times.

27

28  (*Id.*).  Those other issues, were, of course, dealing with the ramifications of the Article.  In addition,

23

as set forth above, there was a significant dip in sales on December 17, 2010 – a day after the Article was published.  (*See* Exh. O, ¶¶ 18-22).  That is a restraint on trade.   In any event, those are questions of fact for the jury to decide.

Third, to state a cause of action under the fraudulent prong of the UCL, "it is necessary only to show members of the public *are likely to be deceived*; allegations of actual deception and reasonable reliance are unnecessary."  *Gruen v. Edfund*, 2009 WL 2136785, * 5 (N.D. Cal. 2009) (emphasis added). "'Fraudulent' as used in § 17200 'does not refer to the common law tort of fraud but only requires a showing members of the public are likely to be deceived.'"  *Express, LLC v. Fetish Group, Inc.*, 464 F.Supp.2d 965, 980 (C.D. Cal. 2006) (citation omitted); *see also Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 319 F.Supp.2d 1059, 1077-78 (C.D.Cal.2003) ("A business practice is fraudulent if members of the public are likely deceived.").  "This distinction reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices."  *In re Tobacco II Cases*, 46 Cal. 4th at 312.

Defendants' conduct, namely falsely representing to the public that Ozimals owned a copyright, and that Amaretto infringed upon that copyright, *likely deceived the public*.  Indeed, the comments to the Article confirm that the public was likely deceived. An avatar named "Nikkos Alexiou" commented (in part), "You have every right to protect your intellectual property, and for Amaretto to file a lawsuit is kind of ridiculous. They could have better spent that time and money tweaking the scripts of their horses to make THEM a unique product and not just a bunny clone." (Exh. J).  Likewise an avatar named "historieforteller" commented (in part), "What would Arametto [sic] or cats or others have been without the Ozimals?" (*Id*.) The third Avatar, named "Whispers." commented, "It is sad that that some people can't come up with their own creative ideas. It would have been better for the whole community."  (*Id*.).

As detailed above, Amaretto was in fact damaged as a result of Defendants' conduct.  It lost sales.  But as noted, damages are not the key focus. Rather, Defendants' conduct is.  *In re Tobacco II Cases*, 46 Cal. 4th at 312.

Accordingly, the 17200 UCL claim must survive summary judgment and/or adjudication.

24

## VIII.   CONCLUSION

For the foregoing reasons, Amaretto respectfully requests this Court deny Defendants' Motion for Summary Judgment, or in the Alternative, Summary Adjudication.


Dated:  April 12, 2013                              KELLER, SLOAN, ROMAN & HOLLAND LLP



                                        By: _____/S/_____
                                             ANNE E. KEARNS
                                             Attorney s for Plaintiff AMARETTO RANCH BREEDABLES, LLC