1
2
3
4
5
6
7
8
9
10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

AMARETTO RANCH BREEDABLES,
LLC,

    Plaintiff,

  v.

OZIMALS, INC., et al.,

    Defendants.
_____/

No. CV 10-5696 CRB

**ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT**

12
13
14
15
16
17

   This case began as a copyright dispute between business competitors who sell virtual animals in an online simulated world known as Second Life.  In November 2012, the Court disposed of the parties' copyright claims and counterclaims.  Order (dkt. 146).  Presently before the Court is Defendant Ozimals, Inc.'s ("Ozimals") Motion for Summary Judgment on Plaintiff Amaretto Ranch Breedables's ("Amaretto") four remaining state law claims: (1) defamation; (2) trade libel; (3) intentional interference with prospective business advantage; and (4) unfair competition in violation of California Business and Professions Code section 17200, et seq. (the "UCL").  Mot. (dkt. 162).

**I. BACKGROUND**

   The following facts are not in dispute.  Second Life is an online virtual world created by Linden Research.  Stibbards Decl. (Ex. A to dkt. 124-1) ¶¶ 6-9. Users are represented in the virtual world by an avatar and participate in activities such as socializing with other users, traveling the virtual world, and engaging in commerce using Second Life currency,

18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

1  known as the Linden dollar.  Id.  Users receive Linden dollars by paying Linden Research

2  real money.  Id.

3          Third-party software developers, using a programming language unique to Second

4  Life, can create and market their own 3-D objects to operate in Second Life's virtual world.

5  Id. ¶¶ 10-13.  The parties here are two companies that developed competing "breedable

6  animals" for purchase and use in Second Life; Ozimals developed a virtual bunny, and

7  Amaretto developed a virtual horse.  Sargent Decl. (dkt. 129-1) ¶ 2.  The "breedable" label

8  reflects that the virtual animals were programmed to function in certain ways like real

9  animals.  Jadzewski Decl. (Ex. B to dkt. 124-1) ¶ 11.  For example, the "breedable animals"

10  reproduced and passed on genetic traits.  Id.

11          Ozimals' bunny appeared first, Sargent Decl. ¶ 6, and after some informal

12  communications between representatives of Ozimals and Amaretto in the ensuing months

13  about the possibility that Amaretto's horse infringed Ozimals' copyright, id., Amaretto

14  released its virtual horse, id. ¶ 9.  Ozimals sent Amaretto a cease-and-desist letter ("Letter")

15  in November 2010, see Second Am. Compl. (Ex. 1 to dkt. 92), and a few weeks later

16  Ozimals received a registration certificate from the U.S. Copyright Office for its "Ozimals

17  Animal Scripts" computer program (the "'661 Copyright"), Kearns Decl. (Ex. I to dkt. 124-

18  1).

19          The following month, Ozimals sent a Digital Millennium Copyright Act (DMCA)

20  takedown notice to Linden Research, asserting that Amaretto's horse infringed Ozimals'

21  copyright, and requesting that Linden Research remove Amaretto's horse from Second Life.

22  See Second Am. Compl. Ex. 3.  Amaretto responded with a counter-DMCA notice to Linden

23  Research, id. Ex. 4, and filed the instant action in this Court, where it secured a temporary

24  restraining order and preliminary injunction preventing Linden Research from removing its

25  virtual horses, see dkts. 29, 49.

26          On December 16, 2010, after Amaretto filed the instant action, Ozimals posted on its

27  blog an entry titled "Regarding the Lawsuit Against Ozimals by Amaretto," discussing the

28  dispute to "address [the reader's] questions and explain the reasons behind the steps

[Ozimals] have taken." Blog Entry (Ex. J to dkt. 166). The claims now at bar arise from what was said in that Blog Entry.

The Blog Entry, signed by "Your Ozimals Team," claimed that Amaretto "release[d] a product that infringed on the intellectual property of Ozimals" and that "what Amaretto did is not fair competition." Id. Additionally, the Blog Entry stated that "the current state of the Amaretto horse product was a near complete clone of the Ozimals concept," that Ozimals did not want Amaretto's "unlawful decisions" to "affect the breedable community in such a negative way," and that Ozimals hoped the present action established "a safer environment for great ideas to flourish in Second Life." Id. Beneath the Blog Entry were three reader comments offering their support for Ozimals and their right to protect their intellectual property. See id.

The Blog Entry linked to an online chat ("Chat") between Candace Sargent ("Sargent"), co-owner of Ozimals, and an "Amaretto Dev Team Member," and linked to the Letter that Ozimals' attorney previously sent to Amaretto. Id. In the Chat, Sargent stated that Ozimals had a copyright in its bunnies and "in the way our game is set up." Chat (Ex. K to dkt. 166). Sargent went on to say that Amaretto's horse had the same copyrighted "core concepts" as Ozimals' bunny. Id. In the Letter, Ozimals' attorney asserted that Amaretto's virtual horse infringed upon Ozimals' "intellectual property rights," namely a copyright in its breedable virtual bunny in violation of the United States Copyright Act. Letter (Ex. A to dkt. 166). Specifically, Ozimals' attorney claimed that Amaretto had "virtually cloned all aspects of the Ozimals Works, with the only material difference being that its animal is cloaked as a horse," and that Amaretto is "not engaged in fair competition." Id. Ozimals' counsel identified specific examples of the alleged infringement, such as identical genetic traits (eye color); identical settings (roaming range); and identical expression of functionality (capacity to breed at age seven). Id.

Before this Court, Amaretto alleged that Ozimals' DMCA notice was copyright misuse under 17 U.S.C. § 512(f) and sought a declaration that its horses did not infringe. See Compl. (dkt. 1); Appl. for TRO (dkt. 3). Ozimals counterclaimed for copyright infringement.

United States District Court
For the Northern District of California

3

United States District Court
For the Northern District of California

1  <u>See</u> Answer (dkt. 106).  This Court granted Amaretto's Motion for Summary Judgment on

2  Ozimals' copyright infringement counterclaim because Ozimals lacked standing to sue on the

3  copyright at issue.  <u>See</u> Order at 6.  Additionally, this Court denied in part Amaretto's

4  Motion for Summary Judgment as to the declaratory judgment and copyright misuse claims,

5  and dismissed those claims for lack of subject matter jurisdiction.  <u>See</u> <u>id.</u> at 7-8.

6      Ozimals now moves for summary judgment on Amaretto's four remaining claims, all

7  stemming from Ozimals' Blog Entry: (1) defamation; (2) trade libel; (3) intentional

8  interference with prospective business advantage; and (4) unfair competition in violation of

9  the UCL.  <u>See</u> Mot.[1]

10  **II.   LEGAL STANDARD**

11      Summary judgment is proper when "the movant shows that there is no genuine

12  dispute as to any material fact and the movant is entitled to judgment as a matter of law."

13  Fed. R. Civ. P. 56(a).  A dispute is "genuine" only if there is a sufficient evidentiary basis on

14  which a reasonable fact finder could find for the nonmoving party, and a fact is "material"

15  only if it could affect the outcome of the suit under governing law.  <u>See</u> <u>Anderson v. Liberty</u>

16  <u>Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986).  A principal purpose of the summary judgment

17  procedure "is to isolate and dispose of factually unsupported claims."  <u>Celotex Corp. v.</u>

18  <u>Catrett</u>, 477 U.S. 317, 323-24 (1986).  "Where the record taken as a whole could not lead a

19  rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

20  <u>Matsushita Elec. Ind. Co. v. Zenith Radio</u>, 475 U.S. 574, 587 (1986).

21      "'[The] standard [for granting summary judgment] mirrors the standard for a directed

22  verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct

23  a verdict if, under the governing law, there can be but one reasonable conclusion as to the

24  verdict.'"  <u>Anderson</u>, 477 U.S. at 250.  When a party fails to make a showing sufficient to

25  establish the existence of an element essential to that party's case, and on which that party

28      [1] In their reply brief, Ozimals objected to and moved to strike portions of a declaration attached to Amaretto's opposition brief.  Reply (dkt. 169) at 2-4.  The objections are DENIED as moot.

4

1 | will bear the burden of proof at trial, the moving party is entitled to judgment as a matter of

2 | law.  See Celotex, 477 U.S. at 322-23.

3 | **III.     DISCUSSION**

4 |      **A.     Amaretto's Defamation Claim**

5 |      The statements made in Ozimals' Blog Entry do not constitute actionable defamation

6 | because the statements are constitutionally protected opinions.  Therefore, Ozimals is entitled

7 | to judgment as a matter of law on Amaretto's defamation claim.[2]

8 |      "Defamation requires a publication that is false, defamatory, unprivileged, and has a

9 | tendency to injure or cause special damage."  Hawran v. Hixson, 209 Cal. App. 4th 256, 277

10 | (Cal. Ct. App. 2012).  Pure opinions – "those that do not imply facts capable of being proved

11 | true or false" – are protected by the First Amendment.  Partington v. Bugliosi, 56 F.3d 1147,

12 | 1153, n.10 (9th Cir. 1995).  Assertions of fact and statements that "may imply a false

13 | assertion of fact, however, are not protected."  Id.  Whether a statement is an assertion of fact

14 | or opinion is a question of law for the court to decide.  Dworkin v. Hustler Magazine, Inc.,

15 | 867 F.2d 1188, 1193 (9th Cir. 1989).

16 |      To determine whether a statement implies an assertion of fact, the Ninth Circuit

17 | applies a three-factor test.  See Art of Living Found. v. Does, No. 10-CV-05022-LHK, 2011

18 | U.S. Dist. LEXIS 63507, at *13-15 (N.D. Cal. June 15, 2011) (citing Underwager v. Channel

19 | 9 Australia, 69 F.3d 361, 366 (9th Cir. 1995)).  First, a court reviews the statement in its

20 | "broad context," which includes the general tenor of the entire work, the subject of the

21 | statement, the setting, and the format of the work.  Id.  Second, the court considers the

22 | "specific context" and content of the statement, analyzing the extent of figurative or

23 | hyperbolic language used and the reasonable expectations of the audience in that particular

24 |

25 |           ———————————

26 |     [2]  Ozimals argues that certain communications, specifically the DMCA Notices, the Blog Entry, the Chat, and the Letter, are not actionable per the litigation privilege.  See Mot. at 4-9.  As this Court already held, the DMCA Notices and Letter are protected by the litigation privilege and are non-actionable in and of themselves.  See Mot. to Dismiss Order (dkt. 104); Amaretto Ranch Breedables, LLC v. Ozimals, Inc., 790 F. Supp. 2d 1024, 1030 (N.D. Cal 2011).  The Court need not rule on whether the Blog Entry or Chat are protected by the litigation privilege; the issue is moot because Ozimals would still prevail even if the communications were deemed actionable.

United States District Court
For the Northern District of California

1    situation.  Id.  Finally, the court looks to whether the statement itself is sufficiently factual to

2    be susceptible of being proved true or false.  Id.

3         Amaretto's defamation claim rests on eleven statements made by Ozimals: (1) that

4    Amaretto's (earlier) horse product was a "near complete clone of the Ozimals concept of a

5    breedable"; (2) that "Ozimals works are protected by copyright"; (3) that Amaretto's (earlier)

6    horse product was "nearly identical to the Ozimals work and would be infringing on the

7    copyrights that Ozimals held if Amaretto released it"; (4) that Amaretto released a product

8    that was "even more similar than what had been presented"; (5) that Amaretto must develop

9    their own "concept so that any problems could be avoided"; (6) that Amaretto released a

10   product "that infringed on the intellectual property rights of Ozimals"; (7) that Ozimals

11   contacted an intellectual property attorney to gather information on the "scope of the

12   infringement"; (8) that Ozimals did not want Amaretto's "unlawful decisions" to "affect the

13   breedable community in such a negative way"; (9) that Ozimals was the first to develop

14   breedable animals in Second Life ("Since Ozimals began development, there have been

15   many other breedable pets introduced"); (10) that "what Amaretto did is not fair competition

16   and if Ozimals did not stand up for copyright protections, we would be doing a disservice not

17   just to our company but every company in Second Life that develops a unique concept and

18   brings it into our virtual world"; and (11) that "[w]e are fortunate to be able to invest into

19   protecting our intellectual property and part of what we hope to do with this action is to help

20   establish a safer environment for great ideas to flourish in Second Life."  See Second Am.

21   Compl. ¶¶ 25-41.

22                          **1.    Broad Context**

23        The first factor the Court considers is the broad context of Ozimals' statements,

24   paying particular attention to setting, subject matter, format, and tenor.  Underwager, 69

25   F.3d at 366.  Ozimals made the statements at issue on its own blog to "explain the reasons

26   behind the steps [Ozimals] has taken."  Blog Entry.  In this context, readers are less likely to

27   view statements as assertions of fact.  See Underwager, 69 F.3d at 366-67 (audience would

28   likely view comments made in context of heated debate as "spirited critique" and "would

6

1    expect emphatic language on both sides"); <u>Info. Control v. Genesis One Computer Corp.</u>,

2    611 F.2d 781, 784 (9th Cir. 1980) (in context of legal dispute, "the audience may anticipate

3    efforts by the parties to persuade others to their position by use of epithets, fiery rhetoric or

4    hyperbole, [and thus] language which generally might be considered as statements of fact

5    may well assume the character of statements of opinion"); <u>Art of Living Found.</u>, 2011 U.S.

6    Dist LEXIS 63507, at *19 (statements made on a personal blog are less likely to be viewed

7    as statements of fact); <u>Nicosia v. De Rooy</u>, 72 F. Supp. 2d 1093, 1101 (N.D. Cal. 1999)

8    (statements made on personal website, through Internet discussion groups, and as part of

9    heated debate are less likely to be viewed as statements of fact).

10        Amaretto argues that because Ozimals' Blog Entry does not contain "heated debate,"

11   it is unlike the previously cited cases, and the statements made there should be interpreted as

12   assertions of fact.  <u>See</u> Opp'n (dkt. 166) at 12-13.  That is incorrect.  The Blog Entry was a

13   potential forum for "heated debate."  <u>See</u> <u>Obsidian Fin. Group v. Cox</u>, No. CV-11-57-HZ,

14   2011 U.S. Dist. LEXIS 73413, at *16 (D. Or. July 7, 2011) (holding that a blog is a forum

15   for "heated debate," given the fact that there are reader postings, even if the postings suggest

16   that the debate has been one-sided).  And, as Ozimals points out, it would be odd to hold

17   that a blog <u>is not</u> actionable if an opposing party engages in "heated debate," but <u>is</u>

18   actionable if an opposing party does not.  <u>See</u> Reply at 7.  The result would be that a party,

19   by choosing not to comment on an opposing party's blog, could create a defamation cause of

20   action.  Even absent "heated debate," a reader of Ozimals' Blog Entry would realize that

21   Ozimals wrote it from its own perspective to paint itself in a better light, and would not

22   understand it to be "statements of fact rather than the predictable opinion of . . . one side

23   about the other's motives."  <u>See</u> <u>Info. Control</u>, 611 F.2d at 784.

         **2.    Specific Context**

24        The Court next considers the "content of the allegedly defamatory statements, which

25   includes the extent of figurative and hyperbolic language and the reasonable expectations of

26   the readers."  <u>Nicosia</u>, 72 F. Supp. 2d at 1102.  Many of Ozimals' statements, when

27   considered in isolation, appear to assert facts.  These include "Ozimals works are protected

28

7

by copyright," Amaretto "infringed on the intellectual property of Ozimals," and "the Amaretto horse product was a near complete clone of the Ozimals concept of a breedable." Blog Entry.

In context, however, those statements fail to amount to such assertions or imply defamatory facts. The statements in Ozimals' Blog Entry expressed Ozimals' opinions and purported to apply Ozimals' understanding of copyright law as applied to the facts. See Franklin v. Dynamic Details, Inc., 116 Cal. App. 4th 375, 378 (Cal. Ct. App. 2004) (statements in e-mails that recited facts for purpose of applying copyright and contract law to them merely expressed opinions). Likewise, by linking to the Chat and Letter, Ozimals gave its blog readers additional context to decide whether to accept or reject Ozimals' opinions based on their own independent evaluations. See id. (statements in e-mails were opinions because readers were provided facts upon which the opinions were based).

Amaretto argues that since Ozimals' Blog Entry did not mention Amaretto's viewpoints and failed to link to Amaretto's Complaint or Response, it should be viewed as an actionable, one-sided, false attack. See Opp'n at 13-14. However, Amaretto provides no case law to support its theory that a blog must present both sides of an argument to protect it from a defamation cause of action. As the court noted in Art of Living Foundation, accusations of criminal activity, like other statements, are not actionable if the underlying facts are disclosed. See 2011 U.S. Dist. LEXIS 63507, at *20.

Here, Ozimals linked to the Chat and Letter. See Partington, 56 F.3d at 1156 ("The courts of appeals that have considered defamation claims . . . have consistently held that when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment."); Moldea v. N.Y. Times Co., 22 F.3d 310, 317 (D.C. Cir. 1994) ("[B]ecause the readers understand that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation.") (quoting Moldea v. N.Y. Times Co. ("Moldea I"), 15 F.3d 1137, 1144-45 (D.C. Cir. 1994)); Art of Living Found., 2011 U.S. Dist. LEXIS 63507, at *21.

8

### 3.      Statements Susceptible of Being Proved True or False

Lastly, the Court determines whether the statements at issue are provable as true or false.  Underwager, 69 F.3d at 366.  In conducting its inquiry, the Court is guided by the maxim that "where the question of truth or falsity is a close one, a court should err on the side of nonactionability."  Partington, 56 F.3d at 1159.

Amaretto maintains that Ozimals' statements are necessarily false because  "Ozimals is not, nor has it ever been, the 'owner' of the copyright in the bunnies (to the extent there is one) - and Defendants knew it before they posted the Article."  Opp'n at 14.  Additionally, Amaretto contends that Ozimals' statements were reckless because Amaretto "pointed out to [Ozimals] all of the reasons why the traits of the Ozimals' bunnies were not copyrightable in its Response to the Cease & Desist Letter – prior to [Ozimals] posting the Article."  Id. at 16.  Amaretto claims that, because the statements are provable as true or false, they should be construed as fact rather than opinion.

Amaretto offers no evidence that Ozimals knew that it did not "own" a copyright.  Whether Ozimals "owned" the copyright is a murky legal issue that has divided federal circuits, with the Ninth Circuit's position being an outlier, and so whether Amaretto owned the copyright depended on jurisdiction.  Moreover, Ozimals' rights in the Ninth Circuit as a non-exclusive licensee could be characterized as a form of ownership.

In sum, Ozimals' statements reflecting its belief that the Amaretto horse "infringed on the intellectual property rights of Ozimals" might be provable as true or false after a lengthy jurisdiction-sensitive lawsuit, but looking at all three Underwager factors, the Court concludes that Ozimals' statements were merely expressions of opinion, not assertions of objective fact.  Thus, Ozimals' statements were not defamatory.

Accordingly, this Court GRANTS Ozimals' summary judgment motion on Amaretto's defamation claim.

//

//

//

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.    Amaretto's Trade Libel Claim**

Ozimals' summary judgment motion on Amaretto's trade libel claim is GRANTED

because (1) statements of opinion rather than fact are not actionable as libel, and (2)

Amaretto cannot produce evidence of special damages.

Trade libel is the intentional disparagement of the quality of property that results in

pecuniary damage to the plaintiff.  See Nichols v. Great Am. Ins. Cos., 169 Cal. App. 3d

766, 773 (Cal. Ct. App. 1985).  The cause of action for trade libel requires: (1) a publication,

(2) which induces others not to deal with plaintiff, and (3) special damages.  Erlich v. Etner,

224 Cal. App. 2d 69, 73 (Cal. Ct. App. 1964).  To be actionable, the defamatory statement

must be a false statement of fact; statements of opinion alone will not support a cause of

action for trade libel.  See ComputerXpress, Inc. v. Jackson, 93 Cal. App. 4th 993, 1010-11

(Cal. Ct. App. 2001).  To establish trade libel, the plaintiff must plead and prove, first, that

the defamatory statement at issue was one "disparaging the quality of [the plaintiff's]

property" that the defendant "should recognize is likely to cause pecuniary loss."  Id. at

1010.  The plaintiff must also prove that the statement played "a material and substantial

part in inducing others not to deal with [the plaintiff]."  Erlich, 224 Cal. App. 2d at 73.

General statements of harm do not sufficiently identify special damages.  See Luxpro Corp.

v. Apple Inc., No. C 10-03058 JSW, 2011 U.S. Dist. LEXIS 35008, at *42 (N.D. Cal. Mar.

24, 2011).

Amaretto's claim for trade libel fails for the same reason that its defamation claim did

- the statements at issue are constitutionally protected opinions.

Additionally, Amaretto fails to sufficiently identify special damages.

> [It] is not enough to show a general decline in . . . business resulting from the
> falsehood, even where no other cause for it is apparent, and that it is only the
> loss of specific sales that can be recovered.  This means, in the usual case, that
> the plaintiff must identify the particular purchasers who have refrained from
> dealing with him, and specify the transactions of which he claims to have been
> deprived.

Erlich, 224 Cal. App. 2d at 73-74; see also Luxpro Corp., 2011 U.S. Dist. LEXIS 35008, at

*42 (Although a plaintiff does not need to plead a specific dollar amount, the plaintiff should

allege an "established business, the amount of sales for a substantial period preceding the

10

1   publication, the amount of sales subsequent to the publication, [and] facts showing that such

2   loss in sales were the natural and probable result of such publication.").

3       Here, Amaretto contends that its sales dipped and that it was forced to give away free

4   "food" to alleviate customer concerns about its horses' viability.  Opp'n at 20.  Amaretto's

5   Lost Profits Report contains expert testimony stating that it incurred lost profits as a result of

6   Ozimals' alleged misconduct.  See Lost Profits Report at 5.  That Report, however, does not

7   identify "particular purchasers" or "specify the transactions" lost because of Ozimals' Blog

8   Entry.

9       In its Second Amended Complaint, Amaretto alleges that Ms. Smith, an Amaretto

10  customer, "specifically stopped buying Amaretto's products since the conduct of the

11  Defendants caused her to question Amaretto...."  Second Am. Compl. at 15.  However,

12  Amaretto does not support this allegation with any evidence in the record.  For the foregoing

13  reasons, this Court GRANTS Ozimals' summary judgment motion on Amaretto's trade libel

14  claim.

15      **C.      Amaretto's Intentional Interference with Prospective Business Advantage
                Claim**

16      Ozimals' summary judgment motion on Amaretto's intentional interference with

17  prospective business advantage claim is GRANTED because Amaretto cannot produce

18  evidence that Ozimals knew of any specific economic relationship between Amaretto and a

19  third party.

20      To state a claim for intentional interference with prospective economic advantage, a

21  plaintiff must prove the following:

22
        (1) an economic relationship between the plaintiff and some third party, with the
23      probability of future economic benefit to the plaintiff; (2) the defendant's knowledge
        of the relationship; (3) intentional acts on the part of the defendant designed to disrupt
24      the relationship; (4) actual disruption of the relationship; and (5) economic harm to the
        plaintiff proximately caused by the acts of the defendant.  The tort of intentional
25      interference with prospective economic advantage does not require a plaintiff to plead
        that the defendant acted with the specific intent, or purpose, of disrupting the
26      plaintiff's prospective economic advantage.  Instead, to satisfy the intent requirement
        for this tort, it is sufficient to plead that the defendant knew that the interference was
27      certain or substantially certain to occur as a result of its action.

28  Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1153 (Cal. 2003).

**United States District Court**
For the Northern District of California

1    Amaretto argues that Ozimals was "well aware that Amaretto had economic

2   relationships with Second Life customers" and that Ozimals intentionally disrupted

3   Amaretto's business during the holiday season by publishing defamatory statements and

4   committing trade libel.  Opp'n at 21-22.  But, in order to state a claim for intentional

5   interference with prospective business advantage, it is essential that the plaintiff allege facts

6   showing that the defendant interfered with the plaintiff's relationship with a particular

7   individual.  See, e.g., Westside Ctr. Assocs. v. Safeway Stores 23, Inc., 42 Cal. App. 4th 507,

8   527 (Cal. Ct. App. 1996) (Defendant must be aware that actions would frustrate expectations

9   of specific, even if unnamed, third party); Damabeh v. 7-Eleven, Inc., No. 5:12-CV-1739-

10  LHK, 2013 U.S. Dist. LEXIS 66565, at *29 (N.D. Cal. May 8, 2013).

11   Here, Amaretto specifies Ms. Woods and Ms. Smith as two customers who were

12  induced by Ozimals' Blog Entry not to purchase Amaretto's products.  See Second Am.

13  Compl. ¶¶ 90-93.  However, Amaretto does not provide a declaration from either Ms. Woods

14  or Ms. Smith attesting to that fact.  Moreover, Amaretto provides no evidence that Ozimals

15  knew of these specific relationships or that Ozimals aimed to disrupt them.

16   In addition, Amaretto has failed to establish that Ozimals' alleged conduct was

17  "wrongful apart from the interference itself."  Korea Supply Co., 29 Cal. 4th at 1154.

18  Amaretto relied on the theory that the statements amounted to defamation and trade libel,

19  which this Court has rejected.  Amaretto also indirectly suggests that the timing of Ozimals'

20  blog statements, i.e., that they were made during the holiday shopping season, somehow

21  satisfies that requirement, but it cites no authority for the proposition that a lawful opinion

22  casting a competitor in a negative light during a busy shopping season is independently

23  wrongful.

24   Accordingly, this Court GRANTS Ozimals' summary judgment motion on Amaretto's

25  intentional interference with prospective business advantage claim.

26   **D.     Amaretto's Section 17200 Unfair Competition Claim**

27   Amaretto also seeks injunctive relief under the UCL.  See Opp'n at 21-22.  This cause

28  of action arises out of Ozimals' alleged defamation of Amaretto in its Blog Entry.  Because

12

**United States District Court**
For the Northern District of California

the Blog Entry did not constitute defamation and was neither actionably "unfair" nor fraudulent, Amaretto's UCL claim also fails as a matter of law, and Ozimals' summary judgment motion on Amaretto's UCL claim is GRANTED.

Section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." Cal. Bus. & Prof. Code § 17200. Because section 17200 is written in the disjunctive, "a business act or practice need only meet one of the three criteria—unlawful, unfair, or fraudulent—to be considered unfair competition under the UCL." Daro v. Superior Court, 151 Cal. App. 4th 1079, 1093 (Cal. Ct. App. 2007). Amaretto asserts that Ozimals' conduct violated all three prongs of the UCL. See Mot. at 16-18.

"Under its 'unlawful' prong, the UCL borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL." Berryman v. Merit Prop. Mgmt., 152 Cal. App. 4th 1544, 1554 (Cal. Ct. App. 2007) (internal quotation marks and citation omitted; alteration in original). "Thus, a violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong." Id.; see Smith v. State Farm Mut. Auto. Ins. Co., 93 Cal. App. 4th 700, 717-18 (Cal. Ct. App. 2001) (unlawful prong forbids "anything that can be properly called a business practice and that at the same time is forbidden by law"). Here, Amaretto admits that its "'unlawful' unfair competition claim is derived from its defamation and trade libel claims." Opp'n at 22-23. Since those claims do not survive, neither does the "unlawful" competition claim. See Hawran, 209 Cal. App. 4th at 277.

The California Supreme Court has yet to establish a definitive test that may be used to determine whether a particular business act or practice is "unfair" for the purposes of the UCL. Drum v. San Fernando Valley Bar Ass'n, 182 Cal. App. 4th 247 (Cal. Ct. App. 2010) (citing Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 187 n. 12 (Cal. 1999). As a result, three tests have developed among state and federal courts. See Davis v. Ford Motor Credit Co., 179 Cal. App. 4th 581, 593-97 (Cal. Ct. App. 2009) (detailing the split in authority in handling consumer UCL cases).

United States District Court
For the Northern District of California

1      One test, which has garnered the most attention from the Ninth Circuit, limits unfair

2   conduct to that which "offends an established public policy" and is "tethered to specific

3   constitutional, statutory, or regulatory provisions." Davis, 179 Cal. App. 4th at 595; Lozano

4   v. AT&T Wireless Servs., 504 F.3d 718, 736 (9th Cir. 2007) (holding that unfairness must be

5   tied to a "legislatively declared" policy).

6      The second test contemplates whether the alleged business practice is "immoral,

7   unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the

8   court to weigh the utility of the defendant's conduct against the gravity of the harm to the

9   alleged victim." Davis, 179 Cal. App. 4th at 594-95.

10      The third test, which borrows the definition of "unfair" from the Federal Trade

11   Commission Act, requires that "(1) the consumer injury must be substantial; (2) the injury

12   must not be outweighed by any countervailing benefits to consumers or competition; and (3)

13   it must be an injury that consumers themselves could not reasonably have avoided." Id. at

14   597.

15      Here, Amaretto's "unfair" competition claim relates to Ozimals' Blog Entry that

16   Amaretto argues "prevented Plaintiff from competing during the all important holiday

17   shopping season" and forced it to give away free virtual "food" to its customers. See Second

18   Am. Compl. ¶ 59.  Amaretto does not argue that Ozimals' alleged conduct was an antitrust

19   violation, nor does it identify any "established public policy" or "specific constitutional,

20   statutory, or regulatory provisions" that its actions violated in spirit. Davis, 179 Cal. App.

21   4th at 595.  And it cites no authority suggesting that a non-defamatory opinion casting a

22   competitor in a negative light during the holiday shopping season amounts to  "immoral,

23   unethical, oppressive, unscrupulous or substantially injurious" conduct. Id. at 594-95.

24   Concluding otherwise would call into question the legality of countless familiar advertising

25   campaigns.

26      Section 17200 claims that are grounded in fraud must show that members of the

27   public are likely to be deceived. See In re Ins. Installment Fee Cases, 211 Cal. App. 4th

28   1395, 1417 (Cal. Ct. App. 2012).  A viable claim does not exist when there "is nothing

United States District Court
For the Northern District of California

1  misleading or deceptive about" the disputed practice.  Id.  Here, Amaretto points to Ozimals'

2  Blog Entry and Ozimals' alleged defamatory statements as fraudulent.  See Opp'n at 24.

3  Amaretto states that Ozimals' Blog Entry "likely deceived the public," and Amaretto cites

4  three reader's comments to the Blog Entry as proof that the public was deceived.  See id.

5  Those comments stated, in relevant part, that "you [Ozimals] have every right to protect your

6  intellectual property" and "[i]t is sad that some people can't come up with their own creative

7  ideas."  Id.   As stated earlier, the Blog Entry itself contained mere statements of opinion that

8  the public was likely to view as such, and so the statements were not likely to deceive.  Thus,

9  this Court GRANTS Ozimals' summary judgment motion on Amaretto's section 17200

10  unfair competition claim.

11  **IV.   CONCLUSION**

12      For the foregoing reasons, this Court GRANTS Ozimals' Motion for Summary

13  Judgment on Amaretto's defamation, trade libel, intentional interference with prospective

14  business advantage, and UCL claims.

15      **IT IS SO ORDERED.**

16

17  Dated: July 9, 2013                          _____

18

19                                      CHARLES  R. BREYER
                                        UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28

15